**IBS FINANCIAL CORP., Plaintiff,**

v.

**SEIDMAN & ASSOCIATES, L.L.C.; Seidman & Associates II, L.L.C.; Federal Holdings, L.L.C.; Seidman Investment Partnership, L.P.; Lawrence B. Seidman; the Benchmark Company, Inc.; the Benchmark Partners, L.P.; Lorraine Di Paolo; Richard Whitman; Ernest Beier, Jr.; and Dennis Pollack, Defendants.**

**Civil Action No. 96–5435 (JEI).**

United States District Court, D. New Jersey.

Jan. 23, 1997.

---

Drinker Biddle & Reath by Edward M. Posner, T. Andrew Culbert, Mary Catherine Roper, and Nancy L. Harris, Philadelphia, PA, for Plaintiff.

Bray, Chiocca, Rappaport & Rothstadt by Peter R. Bray, Parsippany, NJ, for Defendants.

## OPINION

IRENAS, District Judge:

Plaintiff instituted this action on November 12, 1996, seeking a judgment declaring that defendants have failed to make all of the disclosures required by Schedules 13D and 14A of the Securities Exchange Act of 1934, 15 U.S.C. §§ 77b et seq. (the "Exchange Act"); that plaintiff may reject defendants'

nomination to the board of directors for want of these disclosures; and that plaintiff may refuse defendants' request for a shareholder list. Defendants counterclaimed on November 25, 1996 to compel plaintiff to reinstate a board of director seat it eliminated on July 19, 1996. Also on November 25, 1996, defendants applied to the Court for immediate injunctive relief against plaintiff.

In conferences held in Chambers on December 2 and 16, 1996, the parties agreed to complete discovery and depositions on an expedited basis and appear before the Court on January 3, 1997 for a final proceeding to resolve all issues. In accordance with Federal Rule of Civil Procedure 65(a)(2), the parties further agreed that submitted exhibits, deposition transcripts, and trial briefs would comprise a complete and final record for this Court's factual and legal determinations. Having reviewed the record and heard the oral arguments of counsel, the Court now makes the following findings of fact and conclusions of law pursuant to Federal Rule of Civil Procedure 52(a).

## I. FINDINGS OF FACT

### A. *Dramatis Personae*

IBS Financial Corp. ("IBSF") is a savings and loan holding company owning Interboro Savings & Loan Association ("Interboro"). IBSF's shares are publicly registered pursuant to the Securities Exchange Act of 1934, 15 U.S.C. §§ 77b et seq. (the "Exchange Act"), and actively traded. Defendants together own approximately 8.5% of the outstanding shares of IBSF common stock.

Seidman & Associates, L.L.C. (SAL) is a limited liability company managed by Lawrence B. Seidman ("Seidman"). SAL's members are Seidman, Seidcal & Associates, L.L.C. ("Seidcal"), Sonia Seidman ("Mrs. Seidman"), and two other individuals. SAL's investments include not only IBSF stock but also shares of Cali Realty, Atlantic Gulf Communities, AmeriCredit, and PennFed Financial Services. Pursuant to SAL's operating agreement, Seidman as managing member has exclusive and broad investment powers. *See* SAL Operating Agreement at §§ 1.1, 11.1. A majority in interest, however, may

remove or replace Seidman as managing member with or without cause upon payment of a removal penalty. *See id.* § 11.3. Seidcal currently owns a 71.43% interest in SAL but takes no active role in its affairs. *See* Cali Dep. at 13, 17, 29–30, 35–36.

Seidman & Associates II, L.L.C. ("SAL II") is also a limited liability company managed by Seidman. SAL II's members are Mrs. Seidman and Seidcal. SAL II's investments include shares of IBSF and shares of Wayne Bancorp. SAL II's operating agreement grants Seidman as manager exclusive and broad investment powers. *See* SAL II Operating Agreement at §§ 1.1, 11.1. A majority in interest, however, may remove or replace Seidman as manager with or without cause. *See id.* § 11.3. At present, Seidcal owns a 75% interest in SAL II but takes no active role in its affairs. *See* Cali Dep. at 13, 17, 29–30, 35–36.

Federal Holdings, L.L.C. ("Federal") is a limited liability company managed in part by Seidman. Federal's members are Charisma Partners, L.P. ("Charisma") and nine individuals. Federal's only investments are shares of IBSF stock. Under Federal's operating agreement, Seidman is investment manager and enjoys exclusive and complete power to buy, sell, and vote Federal's stock. *See* Federal Operating Agreement at § 10.1. The operating agreement names Kevin Moore ("Moore") administrative manager and clothes him with the authority to make non-investment decisions and remove Seidman as investment manager for cause. *See id.* §§ 10.1, 10.3. Neither Charisma, 8th Floor, nor Moore takes an active role in Federal's investment affairs.

Seidman Investment Partnership, L.P. ("SIP") is a New Jersey limited partnership run by Seidman through Veteri Place Corp. ("Veteri"), SIP's general partner. Seidman is Veteri's sole officer and sole shareholder. SIP's limited partners include SAL, Kaplus Hanover Associates, the Ketron Family Trust, and three individuals. SIP's only investments are shares of IBSF stock. As general partner, Seidman (through Veteri) makes all of SIP's investment decisions. *See* SIP Amended Limited Partnership Agreement at §§ 12, 14(a).

The Benchmark Company, Inc. (BCI) is a New York corporation and a registered broker-dealer. Lorraine Di Paolo ("Di Paolo") and Richard Whitman ("Whitman") are its officers. Benchmark Partners, L.P. ("BPL") is a Delaware limited partnership. BCI, Di Paolo, and Whitman are its general partners.

Last year, defendants nominated Ernest Beier, Jr. ("Beier") and Dennis Pollack ("Pollack") to IBSF's board of directors. This year, defendants nominated Beier and Whitman to IBSF's board of directors. In addition to their above-listed roles, Seidman, Whitman, Di Paolo, Pollack, and Beier each own IBSF stock individually.

Michael Mandelbaum ("Mandelbaum"), Jeffrey Greenberg, Steven Greenberg (together, "the Greenbergs"), Richard Baer ("Baer"), Brent Wolmer ("Wolmer"), and Mrs. Seidman are each IBSF shareholders who have agreements with Seidman regarding their shares. Mandelbaum and the Greenbergs have each agreed in writing that Seidman may buy, sell, and vote their IBSF shares until specified dates. Baer, Wolmer, and Mrs. Seidman have orally agreed to sell and vote their IBSF shares as Seidman directs. These oral agreements are at-will and may be terminated at Baer, Wolmer, and Mrs. Seidman's discretion.

Seidcal is composed of several members of the Cali family. Brant B. Cali is Seidcal's administrative manager, but Seidcal's operating agreement provides that a majority in interest shall manage and conduct Seidcal's business affairs. *See* Seidcal Operating Agreement at § 11.1. According to Brant Cali, the lion's share of Seidcal's funding probably derives from three Cali family "seniors," namely John J. Cali, Angelo Cali, and Ed Leshowitz, who are not themselves Seidcal members but whose children are Seidcal members.

Charisma's general partner is 8th Floor Realty Corp. ("8th Floor"); its limited partners are individuals whose identities have not been revealed. Moore is 8th Floor's vice president.

Defendants SAL, SAL II, Federal, SIP, Seidman, BCI, BPL, Di Paolo, Whitman, Beier, and Pollack comprise an unincorporated entity known as the "IBSF Committee to Maximize Shareholder Value" (the "Committee"). As the name suggests, the Committee aims to maximize the value of their IBSF shares.

### B. *Factual History*

At last year's Annual Meeting, the Committee waged an unsuccessful proxy campaign to elect two independent directors—Whitman and Pollack—to IBSF's board. IBSF's incumbent nominees prevailed and were duly reinstalled as members of the board in 1996. After losing, Seidman reportedly vowed to try again this year. *See* Complaint at ¶ 12 (quoting Jonathan D. Epstein, *Insurgent in N.J. Proxy Fight Sues Thrift Board for Libel,* Amer. Banker, Dec. 21, 1995, at 14). IBSF concedes that its board expected as much. *See* Plaintiff's Counterclaim Mem. Law at 12.

On July 19, 1996, director Frank G. Lockhart ("Lockhart") informed the IBSF board that he intended not to seek reelection. That same day, the board of directors amended its bylaws to reduce the size of the board from seven to six. As a consequence, one rather than two seats will come up for election at this year's Annual Meeting.[1]

At their depositions, director Thomas J. Auchter ("Auchter") and chairman Joseph M. Ochman, Sr. ("Ochman"), offered three reasons for the reduction of the IBSF's board. First, the directors thought that the holding company's board need not be so large given that Interboro's board of directors performs the vast majority of the companies' day-to-day tasks. Director Ochman testified that the board had discussed such a decision on several occasions over the past two years, although IBSF has submitted no evidence or board minutes documenting these discus-

---

1. Defendants contend that Whitman's decision not to run for reelection was part of a plan to reduce the board size to stymie the Committee's election efforts. Beyond conjectures, defendants offer nothing to support this view. In any case, the Court considers it unimportant whether Lockhart desired to serve out his remaining terms on the IBSF and Interboro boards and thereafter retire to Florida, or he declined to run for reelection so that the IBSF board could more conveniently reduce its membership by one.

sions, and director Auchter made no mention of these discussions.

Second, Ochman testified, reduction of the board was part of a long-range plan to maintain flexibility in case future acquisitions necessitated adding directors to the holding company's board. However, at its prereduction size of seven directors, IBSF could feasibly and legally expand its membership to nine to accommodate acquisition candidates. *See* Ochman Dep. at 11–12, 18 (reporting an acceptable range from five to fifteen directors). Moreover, Ochman testified that acquisition candidates would also request seats on Interboro's board of directors, which remains unreduced at seven directors. *See id.* at 33–34.

Third, Auchter and Ochman conceded that the elimination of a board seat was also meant to hinder the Committee's efforts in establishing a presence on IBSF's board. Ochman testified, "In the event there was any proxy contest, [it would be] in the best interest[s] of all shareholders to have only one nominee for directorship rather than two." Ochman Dep. at 13. He elaborated,

[T]he dissident group of shareholders were advocating very clearly in their material and press releases that we should hire an investment banker and put the company up for sale through an auction. The board believed then and firmly believes today that that is absolutely not in the best interest of all our shareholders and that long range, that we can build the franchise, develop the company further and maximize the shareholder value.

*Id.* at 15. A statement attributed to Ochman in the *American Banker* summarizes this sentiment: "The board's decision last month to eliminate a seat, reducing membership to six, is one way to stop the [dissident] group, [Ochman] said." Joanna Sullivan, *Thrift Sues Investors Group Seeking Seat to Push for Sale,* Amer. Banker, Nov. 19, 1996, at 10.

The Court considers this third rationale for eliminating Lockhart's board seat the primary motivation behind the IBSF board's decision. Viewed in the abstract, the board's efficiency and flexibility rationales appear

bona fide and amply justify the elimination of a board seat. Viewed against the backdrop of the impending proxy contest, however, these two justifications seem suspiciously pretextual. Each rationale arose for the first time in depositions taken after the Court alerted the parties to the viability and caselaw applicable to defendants' third counterclaim. In addition, the board's flexibility rationale suffers from the above-mentioned inconsistencies, and its efficiency rationale lacks the testimonial or documentary corroboration one might expect.

In contrast, no such doubt can be cast on the board's third rationale for eliminating Lockhart's seat. Before defendants interposed their counterclaims, Ochman explained that the board's decision was meant to thwart the Committee's efforts at establishing a presence on the IBSF board. *See* Sullivan, *supra,* at 10. Both Auchter and Ochman admitted as much in their depositions. Indeed, at his deposition, Ochman explained at great length how such a strategy serves the best interests of IBSF and its shareholders. *See* Ochman Dep. at 15. Given these circumstances, this Court can only conclude that the IBSF board eliminated Lockhart's directorship primarily to hinder the Committee's proxy solicitation efforts.

On October 7, 1996, uninformed of the reduction in board size, the Committee notified IBSF of its nomination of Whitman and Beier for the two directorships it thought up for election. The Committee's nomination submission also supplied information required by Article 9.3 of IBSF's Certificate of Incorporation, and formally requested a IBSF's shareholder list in connection with the proxy solicitation.[2] By letter dated October 31, 1996, IBSF responded, itemizing claimed deficiencies in the Committee's nomination submissions, and allowing the Committee several days in which to "cure" them. The Committee responded to IBSF's request but did not cure all of the claimed deficiencies. IBSF then instituted the instant action on November 12, 1996.

---

**2.** Once the Committee learned of the board's decision to eliminate a directorship, it withdrew

Whitman's nomination and left intact Beier's nomination.

The first count of plaintiff's complaint seeks a declaratory judgment that defendants have failed to make all of the disclosures required by Schedules 13D and 14A of the Exchange Act. Plaintiff's second count seeks a declaratory judgment that plaintiff may reject defendants' nomination to the board of directors pursuant to its Certificate of Incorporation for want of these disclosures. Plaintiff's third count seeks a declaratory judgment that plaintiff may refuse defendants' request for a shareholder list. Defendants counterclaimed on November 25, 1996 to compel plaintiff to reinstate the board of director seat it eliminated on July 19, 1996. On December 3, 1996, defendants made an additional filing with the SEC, not because they considered it required but rather in an effort to avoid litigation expenses and moot some of IBSF''s objections. *See* Amendment 9 to Defendants' Schedule 13D.

## II. CONCLUSIONS OF LAW

### A. *Burden of Proof*

Plaintiff bears the burden of proving the material allegations of each of its counts by a preponderance of the evidence. Likewise, defendants bear the burden of proving the material allegations of their counterclaim by a preponderance of the evidence.

### B. *Defendants' 13D Filings*

Exchange Act § 13(d), 15 U.S.C. § 78m(d), and the regulations promulgated thereunder, require any person who acquires beneficial ownership of more than five percent of a class of equity securities to file a statement with the SEC making certain disclosures. Schedule 13D is the form on which such statements are made. *See* 17 C.F.R. § 240.13d–101 (1996). Schedule 13D contains three general instructions and lists seven items which must filers must address. Plaintiff's first count alleges that defendants have failed to supply all of the information required by the general instructions and the regulations and cases interpreting them.

■ Instruction C to Schedule 13D reads, in pertinent part,

If the statement is filed by a general or limited partnership, syndicate, or other group, the information called for by Items 2–6, inclusive, shall be given with respect to (i) each partner of such general partnership; (ii) each partner who is denominated as a general partner or who functions as a general partner of such limited partnership; (iii) each member of such syndicate or group; and (iv) each person controlling such partner or member.

If the statement is filed by a corporation or if a person referred to in (i), (ii), (iii) or (iv) of this Instruction is a corporation, the information called for by the above mentioned items shall be given with respect to ... (b) each person controlling such corporation; and (c) ... [any] other person ultimately in control of such corporation.

To date,[3] defendants have provided information called for by Items 2–6 with respect to each Committee member, the general partners of the limited partnerships among them (SIP and BCI), and the persons they consider to be "controlling" each member. In order to moot IBSF''s 13D claim, defendants have also provided information with respect to each limited partner of SIP, each member of SAL, SAL II, and Federal, and the several persons with whom Seidman has agreements to buy, sell, or vote IBSF stock. *See* Amendment 9 to Defendants' Schedule 13D.[4] IBSF contends these disclosures are still not enough.

#### 1. Seidcal

IBSF argues that Seidcal "controls" SAL and SAL II by virtue of its majority equity interest in each and ability to remove Seidman as the manager of each. Accordingly, IBSF contends that Seidcal falls squarely within subsection (iv) of Instruction C. De-

---

**3.** An amendment which cures a violation of the Exchange Act moots a claim that arises from the failure to file a proper Schedule 13D. *See Treadway Cos. v. Care Corp.,* 638 F.2d 357 (2d Cir. 1980); *Hubco v. Rappaport,* 628 F.Supp. 345, 353 (D.N.J.1985).

**4.** The Third Circuit's decision in *CNW Corp. v. Japonica Partners,* 874 F.2d 193 (3d Cir.1989), arguably requires these disclosures. *Compare id.* at 200–01 *with id.* at 201 n. 8.

fendants counter that Seidman, as managing member of SAL and manager of SAL II, is the only "person controlling" SAL and SAL II within the meaning of the instruction. Thus, defendants argue. Seidcal need not be included in their Schedule 13D.

The SEC defines "control" for the general purposes of Schedule 13D as "possession, direct or indirect, of the power to direct or cause the direction of the management and policies of a person, whether through the ownership of voting securities or otherwise." 17 C.F.R. § 240.12b–2. While this definition and the cases applying it deal more with Item 4's requirement that a beneficial owner disclose his purpose in acquiring securities, e.g., to gain "control" over the issuer, the definition is nevertheless helpful in the instant analysis.

In Louis Loss & Joel Seligman, *Fundamentals of Securities Regulation* (3d ed. 1995), the authors elaborate on the meaning of control and "power to direct management" with respect to the Exchange Act and the Securities Act of 1933, 15 U.S.C. §§ 77a et seq. (the "Securities Act"):

> Control, the Commission has held under the Securities Act, "is not synonymous with direct operation of an enterprise"; it "may be inferred from the conduct of the parties." As the Commission put it in its Report on Investment Trusts, "the word 'control' does not mean day-to-day management of the portfolio company, but means rather that major decisions are probably seldom taken without consulting the investment company or its sponsors, or that the control is at least potential and equivalent at all times to unusual influence."

Loss & Seligman, *supra,* at 378 (citing *Reiter Foster Oil Corp.,* 6 S.E.C. 1028, 1044 (1940) and *Chicago Corp.,* 28 S.E.C. 463, 468 (1948)); *see also id.* at 379 (noting these decisions' relevance in determining control under the Exchange Act). Cases interpreting the meaning of control with respect to Item 4 of Schedule 13D express a similar sentiment. *See, e.g., Chromalloy Amer. Corp. v. Sun Chem. Corp.,* 474 F.Supp. 1341, 1348 (E.D.Mo.) (looking to the "realities of

commerce" to determine control), *aff'd,* 611 F.2d 240, 246 (8th Cir.1979).

■ Looking to the realities of each organization, the Court must conclude that Seidman and not Seidcal controls both SAL and SAL II within the meaning of Instruction C. The operating agreements specifically grant Seidman and not Seidcal the power to manage the daily affairs and the investments of SAL and SAL II. *See* SAL Operating Agreement at §§ 1.1, 11.1; SAL II Operating Agreement at §§ 1.1, 11.1. In practice, Seidman makes all investment decisions without even consulting Seidcal or its members. *See* Cali Dep. at 17, 35–36 (reporting that he learns of the SALs' investments after-the-fact in short, quarterly meetings). Indeed, Seidcal's sole purpose is simply to create a fund for Seidman to invest at his discretion using his specialized knowledge of the banking industry. *See* Cali Dep. at 13 (describing a "fund that [Seidman] was going to steer, direct, run the show on"); *id.* at 30 ("[W]e put up funds and [Seidman] does what he does; it's his call.").

To be sure, Seidcal as owner of a majority equity interest in SAL and SAL II may remove Seidman as manager of each with or without cause. *See* SAL Operating Agreement at § 11.3(c) (additionally requiring payment of a $250,000 removal penalty to Seidman); SAL II Operating Agreement at § 11.3(c). However, to date Seidcal has neither done so, nor indicated any intention of doing so, nor used its majority position to influence Seidman's management in any way. In short, IBSF has failed to meet its burden of demonstrating Seidcal's control over SAL and SAL II. Accordingly, the Court finds that Seidcal does not constitute a controlling person of SAL or SAL II within the meaning of Instruction C to Schedule 13D and thus defendants' filings need not include Seidcal as such.

2. Charisma, 8th Floor, and Moore

IBSF next argues that Charisma, 8th Floor, and Moore "control" Federal by virtue of Charisma's majority interest in Federal, 8th Floor's general partner position in Charisma, and Moore's position as administrative manager of Federal clothed with the authority to remove Seidman as investment manag-

er for cause. Accordingly, IBSF argues that defendants' failure to disclose certain information on Charisma, 8th Floor, and Moore constitutes a violation of Instruction C to Schedule 13D. Defendants respond, as above, that Seidman is the only person in control of Federal's investments, and thus their failure to file information on Charisma, 8th Floor, and Moore does not constitute a violation of Schedule 13D or its instructions.

■ The above discussion makes clear that Moore, in his role as administrative manager of Federal, does not "control" Federal for the purposes of Instruction C to Schedule 13D. Federal's operating agreement specifically relegates investment-making authority to Seidman and not Moore. *See* Federal Operating Agreement at §§ 1.1, 10.1. As with SAL and SAL II, Seidman makes all of Federal's investment decisions without consulting Moore or other investors. *See* Moore Dep. at 10–12 (reporting he learns of Federal's investments in occasional oral reports); *id.* at 46–47 (confessing no knowledge of the merits of Federal's holdings). Indeed, like SAL and SAL II, Federal's purpose is merely to create a fund for Seidman to invest in financial institutions at his discretion. *See id.* at 9, 13.

Although Moore can remove Seidman as investment manager for cause before the end of Seidman's term, *see* Federal Operating Agreement at § 10.1, nothing in the record suggests that Seidman has acted in ways which constitute "cause" within the meaning of the Operating Agreement. Nor has IBSF alleged that Moore intends to remove Seidman or that he uses his authority to do so to influence Seidman's investment decisions. Thus, IBSF has failed to meet its burden of demonstrating Moore's control over Federal. Accordingly, the Court concludes that Moore is not a "controlling person" within the meaning of Instruction C to Schedule 13D and that he need not be reported as such.

■ IBSF's argument that Charisma and 8th Floor control Federal more or less restates its argument that Moore controls Federal. The Court rejects this argument with respect to Charisma and 8th Floor as well. Nothing in Federal's Operating Agreement grants Charisma, as majority equity owner, or 8th Floor, as Charisma's general partner, any rights regarding investment or other decisions. Accordingly, the Court concludes that Charisma and 8th Floor are not "controlling persons" within the meaning of Instruction C to Schedule 13D either. The Committee need not report Charisma and 8th Floor as such.

## C. Defendants' 14A Disclosures

Schedule 14A is a document which the proxy rules and regulations require to be filed by all "participants" involved in the solicitation of proxies in connection with the election of officers at any annual meeting. *See* 17 C.F.R. § 240.14a–101 (1996). In pertinent part, Schedule 14A requires identification of all participants in the solicitation process, a description of their interests, and information regarding any agreements participants have made with others concerning an issuer's stock. *See id.* Plaintiff's first count alleges that defendants have failed to make all of the disclosures that Schedule 14A and the cases interpreting it require.

Instruction 3 to Item 4 of Schedule 14A defines "participant" for the purposes of this dispute. The definition includes:

(iii) any committee or group which solicits proxies, any member of such committee or group, and any person whether or not named as a member who, acting alone or with one or more other persons, directly or indirectly takes the initiative, or engages, in organizing, directing, or arranging for the financing of any such committee or group;

(iv) any person who finances or joins with another to finance the solicitation of proxies ...;

(v) any person who lends money or furnishes credit or enters into any other arrangements, pursuant to any contract or understanding with a participant, for the purpose of financing or otherwise inducing the purchase, sale, holding or voting of securities of the registrant by any participant or other persons, in support of or in opposition to a participant; and

(vi) any person who solicits proxies.

Schedule 14A, Item 4, Instruction 3(a).[5]

Item 5(b)(1)(viii) of Schedule 14A requires disclosure of certain information about "participants." It provides that filers shall

state whether or not the participant is, or was within the past year, a party to a contract, arrangements or understandings with any person with respect to any securities of the registrant.

Schedule 14A, Item 5(b)(1)(viii). If a participant is or was a party to such a contract, arrangement or understanding, Item 5(b)(1)(viii) further requires that filers disclose the names of the parties to such contracts, arrangements, or understandings, and the details thereof. *See id.*

To date, defendants have identified each Committee member as a "participant," revealed the interests of each, the partnership or operating agreement of each, and disclosed contracts, arrangements and understandings between Seidman and various people with respect to IBSF stock (Mandelbaum, the Greenbergs, Baer, Wolmer, and Mrs. Seidman). IBSF contends that Exchange Act Schedule 14A requires more.

### 1. Seidcal, Charisma, and 8th Floor

IBSF argues that Seidcal, Charisma, and 8th Floor are each participants within the meaning of the proxy rules and thus additional disclosures regarding each are required. *See* Schedule 14A, Item 4, Instruction 3(a). Specifically, IBSF maintains that Seidcal, Charisma, and 8th Floor "have each 'engaged' 'directly or indirectly' in 'arranging for the financing' of the [Committee], or have agreed (or acquiesced in the decision of others) to finance the proxy contest." Plaintiff's Mem. Law at 14 (parroting the language of Schedule 14A, Item 4, Instruction 3(a)(iii), (iv)). In addition, IBSF argues, Seidcal, Charisma, and 8th Floor have "each 'entered into [an] arrangement . . . with a participant' which provides for the purchase of IBSF

stock, and the voting of stock." *Id.* (parroting the language of Schedule 14A, Item 4, Instruction 3(a)(v)).

Assertions notwithstanding, IBSF has failed to demonstrate that either Seidcal, Charisma, or 8th Floor has engaged in arranging for the Committee's financing. "Arranging" for financing, like "organizing" and "directing" financing, entails an active money-raising role of some sort. The SEC definition of participant conveys this notion: a participant "solicits," "takes the initiative," and "engages in organizing, directing, or arranging" for financing. Schedule 14A, Item 4, Instruction 3(a)(iii). The few cases on point confirm this interpretation of "participant." *See, e.g., Chris–Craft Indus. v. Independent Stockholders Comm.,* 354 F.Supp. 895, 907–08 (D.Del.1973) (noting a participant's "active" and "instrumental" role in contacting and bringing individuals together, obtaining and furnishing information). As passive investors, Seidcal, Charisma, and 8th Floor fall far short of this definition. Seidcal, Charisma, and 8th Floor took no part in raising money or otherwise arranging for the Committee's financing. Accordingly, Seidcal, Charisma, and 8th Floor are not participants within the meaning of Instruction 3(a)(iii).

IBSF has also failed to demonstrate that Seidcal, Charisma, or 8th Floor have agreed to finance the proxy contest. A proxy contest costs money: professional proxy solicitation firms, public relations and shareholder relations firms, and—of course—law firms need be hired. *See* Loss & Seligman, *supra,* at 433–35. While IBSF has established that Seidcal, Charisma, and 8th Floor each indirectly own IBSF stock through Committee members, nothing in the record suggests that Seidcal, Charisma, or 8th Floor have assumed any proxy contest expenses. *Cf. Chris–Craft,* 354 F.Supp. at 908–10. Accordingly, this Court must conclude that Seidcal, Charisma, and 8th Floor are not participants

---

5. IBSF offers the more expansive definition of participant contained in SEC Division of Corporate Finance, *Proxy Rules and Reference Book* ¶ 302.04 (1980) (a staff-only manual made available "subject to updating and revision" as per Public Availability of Certain Staff Manuals, 48 Fed.Reg. 51,392–01 (SEC 1983)). As Instruction

3 to Item 4 of Schedule 14A—added in 1992, *see* Regulation of Communications Among Shareholders, 57 Fed.Reg. 48,276, 48,293–94 (1992) (codified at 17 C.F.R. § 240 (1996))—seems to have supplanted the manual's definition, the Court defers to the more recent, more official SEC version.

within the meaning of Instruction 3(a)(iv) either.

IBSF's assertion that Seidcal, Charisma, or 8th Floor have entered into arrangements with participants for the purpose of financing or inducing a participant's purchase or voting of IBSF stock also fails for lack of evidence. To be sure, Seidcal is a party to SAL's and SAL II's operating agreements and Charisma and 8th Floor, via Charisma, are parties to Federal's operating agreement. However, nothing in the record suggests that Seidcal, Charisma, and 8th Floor invested in SAL, SAL II, and Federal in order to enable those entities to purchase or vote IBSF stock. The SAL, SAL II, and Federal operating agreements make no mention of IBSF or its stock. Cali and Moore testified that Seidcal, Charisma, and 8th Floor invested in SAL, SAL II, and Federal in order to invest in any number of financial institutions Seidman deemed lucrative, not in any specific stock and not in IBSF stock. *See* Cali Dep. at 13, 30; Moore Dep. at 8–9. Consistent with this understanding, Seidman has invested SAL and SAL II moneys in several financial institutions (but has admittedly only invested Federal moneys in IBSF). Accordingly, IBSF has not met its burden of demonstrating that Seidcal, Charisma, or 8th Floor fall within the definition of participant contained in Instruction 3(a)(v).

Even if Seidcal, Charisma, and 8th Floor are not participants within the meaning of Instruction 3 to Item 4 of Schedule 14A, the Committee must nonetheless disclose information on each of these entities if they are parties to contracts, arrangements, or understandings with participants "with respect to" IBSF stocks. Schedule 14A, Item 5(b)(1)(viii). For the same reasons just given, the Court finds that Seidcal, Charisma, and 8th Floor have not entered into contracts "with respect to" IBSF stock. The SAL, SAL II, and Federal operating agreements do not mention IBSF, nor does the record reflect any understanding on Seidcal's, Charisma's, or 8th Floor's part that SAL, SAL II, or Federal were to invest in any specific stock. Accordingly, the Court finds that defendants need not classify Seidcal, Charisma,

and 8th Floor as participants or provide details on each in their Schedule 14A.

2. Seidman's Clients

■ IBSF next argues that several of Seidman's clients—Mandelbaum, the Greenbergs, Baer, Wolmer, and Mrs. Seidman— have entered into arrangements with Seidman which provide for the purchase and voting of IBSF shares. Indeed, they have. *See* Amendment 8 to Defendants' Schedule 13D at Ex. A; Amendment 9 to Defendants' Schedule 13D at 5, Ex. E. Accordingly, IBSF maintains that each client is a participant within the meaning of Instruction 3(a)(v) to Item 4 of Schedule 14A, and that the details of each arrangement fall within the meaning of Item 5(b)(1)(viii) of Schedule 14A.

As set forth above, Instruction 3(a)(v) to Item 4 of Schedule 14A includes as participants persons who lend money, furnish credit, or otherwise contract with a participant to finance the participant's purchase, sale, holding or voting of an issuer's securities. Seidman's relationships with his clients are not of this type; his clients have not financed and directed the purchase, sale, holding or voting of Seidman's IBSF stock. Quite the other way around. Mandelbaum and the Greenbergs granted Seidman the authority to buy, sell, and vote IBSF stock in their names at his discretion. Baer, Wolmer, and Mrs. Seidman have merely agreed to vote and sell their IBSF stock as Seidman directs. These arrangements thus do not fall within the scope of Instruction 3(a)(v) and the Committee need not classify Seidman's clients as participants.

■ Mandelbaum, the Greenbergs, Baer, Wolmer, and Mrs. Seidman have, however, entered into contracts, arrangements, or understandings with Seidman with respect to IBSF stock within the meaning of Item 5(b)(1)(viii). *See* Amendment 8 to Defendants' Schedule 13D at Ex. A; Amendment 9 to Defendants' Schedule 13D at 5, Ex. E. Accordingly, defendants must, disclose the parties to such contracts, arrangements, or understandings and the details thereof. Since defendants have already done so, this Court finds that defendants have fulfilled

their disclosure obligations under Schedule 14A.

## D. Defendants' Nominations

Article 9.3 of IBSF"s Certificate of Incorporation imposes certain requirements upon a shareholder's submission of nominees for election to its board of directors. Specifically, a notice of nomination must be submitted to IBSF no less than sixty days before the one year anniversary date of the immediately previous Annual Meeting (held on December 15, 1995). Such notice must set forth, as to the nominees and the shareholder(s) submitting the nomination, each's (i) name, age, business and personal addresses; (ii) principal occupation; (iii) number of shares beneficially owned; and (iv) information relating to such persons as is required to be disclosed pursuant to Schedule 14A of the Exchange Act. With regard to the shareholder(s) making the nomination, the notice must additionally set forth (v) the names of other shareholders known to be supporting the nominee; and (vi) the number of shares owned by all other shareholders known to be supporting the nominee. Article 9.3 also empowers the board of directors to reject nominations not made in accordance with these provisions. Having already determined defendants' Schedule 13D and Schedule 14A disclosures adequate, the Court will now address the timeliness of those disclosures.

■ Article 9.3 of the IBSF Certificate of Incorporation permits the board of directors to reject any nominations "not timely made." Article 9.3 also provides for a curing period within which nominating shareholders may perfect submissions the board deems deficient. Defendants having failed to meet the curing period deadline, IBSF urges the Court to read Article 9.3 strictly and permit the board to reject defendants' submissions as untimely.

The Court declines to do so for two reasons. First, IBSF's approval of the Committee's substantially similar submissions just last year no doubt influenced the content and timing of the Committee's current submissions. To allow the board's changed interpretation of its Certificate of Incorporation requirements to work prejudice to defen-

dants' nomination would be "unjust in the eyes if the law." *Miller v. Teachers' Pension & Annuity Fund,* 179 N.J.Super. 473, 477, 432 A.2d 560, 562 (App.Div.) (invoking the doctrine of equitable estoppel), *certif. denied,* 88 N.J. 502, 443 A.2d 714 (1981). This Court will not permit such injustice.

Second, the only prejudice to IBSF is that it did not become aware of the Committee's more recent disclosures until a month or so later than it might have otherwise. However, as a result of this litigation, IBSF has amassed volumes of information on the Committee, its members, its members' members, and so on; it has deposed Seidman, Cali, and Moore; and IBSF is free to disclose any of this information to its shareholders in the upcoming proxy contest—within the limits of the proxy rules. *See Cook United, Inc. v. "Stockholders Protective Comm. of Cook United, Inc.",* Fed.Sec.L.Rep. (CCH) ¶ 96,-875 (S.D.N.Y.1979); *Twentieth Century Fox Film Corp. v. Lewis,* 334 F.Supp. 1398, 1402 (S.D.N.Y.1971). IBSF's decision to adjourn the Annual Meeting without date should also alleviate any prejudice to it, allowing IBSF a sufficient opportunity within which to make an informed response to the Committee's actions.

Accordingly, IBSF may not reject defendants' nomination submissions as deficient or untimely and it must place their nominees on the ballot at the upcoming Annual Meeting to be scheduled.

## E. Shareholder List

■ Exchange Act Rule 14a–7 and N.J.S.A. § 14A:5–28 both require that corporations produce shareholder lists in certain circumstances. Rule 14a–7(b)(2) gives a corporation, and IBSF has exercised, the option to mail the Committee's proxy materials rather than provide it with a shareholder list. Section 14A:5–28 provides no such alternative, requiring production of a list upon the Committee's demonstration of a "proper purpose." Stating its planned rejection of defendants' nominations eviscerates the Committee's proper purpose, IBSF has refused to produce the shareholder list. Because this Court finds that IBSF may not reject defendants' nominations as deficient and untimely,

the Committee has a proper purpose in seeking IBSF's shareholder list.

As for what IBSF must provide, § 14A:5–28(3), literally applied, requires only that a list of all shareholders of record on the corporate books be made available for the Committee's inspection. In *Scott v. Multi–Amp Corp.*, 386 F.Supp. 44 (D.N.J.1974), Judge Lacey held that "fairness compels that management should make available to plaintiffs the same information [that it now has] so that this proxy solicitation campaign can be waged on equal terms by both sides." *Id.* at 51. Section 14A:5–28(4), allowing courts to "award any other or further relief [it] deem[s] just and proper," permits this practice.

For the reasons set forth by Judge Lacey in *Scott,* IBSF must make available to the Committee all of the materials IBSF uses regularly to communicate with its shareholders, including NOBO, Cede & Co., and Phildadep lists, and any other computer records IBSF has in its possession.

## F. Seat Elimination

A board of directors may take certain steps that have the effect of defeating a threat to its control so long as those steps are taken advisedly, in a good-faith pursuit of a legitimate corporate goal, and are reasonable in relation to the threat posed. *See Asarco, Inc. v. Court,* 611 F.Supp. 468, 473–74 (D.N.J.1985) (applying this Delaware rule); *cf. Maul v. Kirkman,* 270 N.J.Super. 596, 614, 637 A.2d 928, 938 (Ch.Div.1994). Where, as here, a board's defensive action has the primary purpose of interfering with the exercise of the shareholder franchise, however, different rights and different issues are at stake, suggesting that a different legal standard ought be applied.

No New Jersey case addresses this issue, but a line of cases from Delaware falls squarely on point. *See, e.g., Schnell v. Chris–Craft Indus.,* 285 A.2d 437 (Del.1971); *Blasius Indus. v. Atlas Corp.,* 564 A.2d 651 (Del.Ch.1988). Under such circumstances, New Jersey courts have looked to the corporate law of Delaware for guidance. *See, e.g., Strasenburgh v. Straubmuller,* 146 N.J. 527, 550, 683 A.2d 818, 829 (1996) (looking to Delaware's "well developed body of law" on

corporate derivative actions); *Matter of Prudential Ins. Co. Derivative Litig.,* 282 N.J.Super. 256, 271–72, 659 A.2d 961, 968–69 (App.Div.1995) ("Delaware is recognized as a pacesetter in the area of corporate law. Indeed, ... 'Delaware corporate law has long been followed—almost reflexively—by other American jurisdictions.' "); *see also Asarco,* 611 F.Supp. at 473–74 (looking to Delaware corporations law for guidance). Consistent with *Erie Railroad Co. v. Tompkins,* 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188 (1938), this Court will follow suit and similarly look to this line of Delaware cases. *See also Tose v. Greate Bay Hotel & Casino, Inc.,* 819 F.Supp. 1312, 1316 n. 7 (D.N.J.1993) (discussing the application of uncertain New Jersey law).

Under the *Blasius* line of cases, board actions taken for the sole or primary purpose of impeding the effectiveness of the shareholder vote are deeply suspect and can only be sustained upon the showing of some compelling justification. *See Blasius,* 564 A.2d at 660–63; *see also Stroud v. Grace,* 606 A.2d 75, 91–92 (Del.1992) ("There can be no dispute that [board action intended to thwart free exercise of the franchise] violates Delaware law."); *Schnell,* 285 A.2d at 438; *Commonwealth Assocs. v. Providence Health Care, Inc.,* 1993 WL 432779, at *8 (Del.Ch. Oct. 22, 1993); *Condec Corp. v. Lunkenheimer Co.,* 230 A.2d 769 (Del.Ch.1967). Chancellor Allen, the author of *Blasius,* explained the reasoning behind this higher standard:

> [The shareholder franchise] is critical to the theory that legitimates the exercise of power by some (directors and officers) over vast aggregations of property that they do not own. Thus, when viewed from a broad institutional perspective, it can be seen that matters involving the integrity of the shareholder voting process involve considerations not present in any other context in which directors exercise delegated power.

*Blasius,* 564 A.2d at 659; *see also Commonwealth Assocs.,* 1993 WL 432779, at *8. This Court finds this reasoning persuasive.

*Blasius* involved expansion, rather than reduction, of board membership, but its rule

is nonetheless applicable here. In *Blasius,* a dissident group presented the board with a stockholder proposal that, if joined by holders of a majority of Atlas's stock, would increase board membership from seven to fifteen (the maximum) and elect eight dissident representatives to the newly enlarged board. This majority of eight would enable the dissident group to institute an ill-conceived plan to substantially liquidate Atlas at a time its future prospects were promising. Motivated primarily to thwart this plan, the Atlas board increased its membership by two to nine and named two friendly individuals to the new directorships. Given the board's maximum size of fifteen, management clinched control.

Although Chancellor Allen found that the Atlas board acted in subjective good faith to serve the best interests of the corporation, he invalidated the board's action as primarily motivated to interfere with the effectiveness of the corporate franchise. He wrote:

> The only justification that can, in such a situation, be offered for the action taken is that the board knows better than do the shareholders what is in the corporation's best interest. While that premise is *no* doubt true for any number of matters, it is irrelevant (except insofar as the shareholders wish to be guided by the board's recommendation) when the question is who should comprise the board of directors. The theory of our corporation law confers power upon directors as the agents of the shareholders; it does not create Platonic masters. It may be that the Blasius restructuring proposal was or is unrealistic and would lead to injury to the corporation and its shareholders if pursued.... The board certainly viewed it that way, and

that view, held in good faith, entitled the board to take certain steps to evade the risk it perceived ... for example, expend[ing] corporate funds to inform shareholders and seek[ing] to bring them to a similar point of view.... But there is a vast difference between expending corporate funds to inform the electorate and exercising power for the primary purpose of foreclosing effective shareholder action. A majority of the shareholders, who were not dominated in any respect, could view the matter differently than did the board. If they do, or did, they are entitled to employ the mechanisms provided by the corporation law and the Atlas certificate of incorporation to advance that view. They are also entitled ... to restrain their agents, the board, from acting for the principal purpose of thwarting that action.

*Blasius,* 564 A.2d at 663.

Since *Blasius,* the standard it articulated has changed very little. The Delaware Supreme Court embraced the test in *Stroud v. Grace,* 606 A.2d 75 (Del.1992), but declined to apply it for factual reasons. *See id.* at 91. The Chancery Court has since applied the test unchanged, but not always found its elements satisfied. *See, e.g., Dolgoff v. Projectavision, Inc.,* 1996 WL 91945, *7–*8 (Del. Ch. Feb. 29, 1996); *Kidsco, Inc. v. Dinsmore,* 674 A.2d 483, 495–96 (Del.Ch.), *aff'd,* 670 A.2d 1338 (Del.1995); *Commonwealth Assocs.,* 1993 WL 432779, at *8; *Stahl v. Apple Bancorp, Inc.,* 579 A.2d 1115, 1122 (Del.Ch. 1990).[6]

■ The IBSF board, like the Atlas board, acted for the primary purpose of impeding the effectiveness of the shareholder vote. By reducing its membership by one,

---

**6.** IBSF attempts to create an additional element to the test articulated in *Blasius.* It asserts that before a court may find manipulation of the corporate franchise, "the franchise process [must have] been engaged." Plaintiff's Counterclaim Mem. Law at 5, 9–11 (citing *Stahl* and *Kidsco*). Because the IBSF board reduced its membership in July, months before the expected December election, IBSF insists the franchise had not yet been "engaged" and thus the onerous *Blasius* standard need not apply.

Whether or not *Stahl* and *Kidsco* graft such a requirement onto the *Blasius* standard, *Commonwealth Associates,* announced after *Stahl* and

*Kidsco,* makes clear that an expected proxy contest, as existed when the IBSF board acted, suffices to invoke *Blasius* scrutiny. There, Chancellor Allen declined to apply Blasius because "the board was not faced with a proxy contest *or an expected proxy contest* when it [acted]." *Commonwealth Assocs.,* 1993 WL 432779, at *8 (emphasis added); *see also id.* at *8 ("The board did not seek to thwart the exercise of the shareholder franchise but sought, in a context where *there was no reason to believe a proxy contest was at hand,* to conclude [director] Dolgoff's service on the board.") (emphasis added).

thereby reducing the seats up for election to one, the IBSF board effectively minimized the potential success of the Committee's impending proxy solicitation. After the reduction, if successful, the Committee could gain only one voice on the IBSF board—one-sixth of the seats—as opposed to two—two-sevenths of the seats. Assuming another successful election the following year, the seat elimination could make the difference between a three-three deadlock and the Committee's outright control of IBSF—five-sevenths of the seats.

Ochman's testimony conveys that the IBSF board, like the Atlas board, acted in subjective good faith to serve the corporation's best interests. Putting IBSF up for sale through an auction, as the board fears the Committee plans to do, may well be bad for the company and bad for the shareholders. *See* Ochman Dep. at 15 (expressing the board's firm belief that it, rather than the Committee, can best "build the franchise, develop the company further and maximize the shareholder value"). But as *Blasius* makes clear, this decision, when manifested as who should comprise the IBSF board, is one for the shareholders, not to be usurped by a board of directors, however good-intentioned.

Thus, IBSF's elimination of a board seat constitutes the type of inequitable interference with the corporate franchise which *Blasius,* its predecessors and progeny, were designed to rectify. As IBSF has not and cannot establish a compelling justification for such action, this Court will invalidate the seat elimination as an unintended violation of the duty of loyalty owed to IBSF shareholders. Accordingly, plaintiff shall restore its board's membership to its prereduction size of seven, two seats of which to come up for election at the upcoming annual meeting.

### III. CONCLUSION

For the reasons set forth above, this Court will enter a judgment (a) declaring that defendants have fulfilled the filing and disclosure requirements imposed by Exchange Act Schedules 13D and 14A; (b) declaring that plaintiff may not reject defendants' nominations to the board of directors as deficient or untimely; (c) declaring that plaintiff may not refuse defendants' request for a shareholder list; and (d) setting aside the IBSF board's July 19, 1996 elimination of a board of director seat. An appropriate judgment will issue on even date herewith.