216 N.J. Super. 363 (1987)
523 A.2d 1078
BERNARD POGOSTIN, PLAINTIFF-RESPONDENT, AND UNIROYAL, INC., ROSS BARZELAY, DAVID BERETTA, NORBORNE BERKELEY, JR., E. PAUL CASEY, FREDERICK COLOMBO, E. RAYMOND COREY, JOSEPH P. FLANNERY, ALLEN J. KROWE, HORACE G. MCDONNEL, JR., BURNELL R. ROBERTS, HOWARD B. WENTZ, JR., AND W. THOMAS YORK, DEFENDANTS-RESPONDENTS,
v.
WILLIAM LEIGHTON, OBJECTOR-APPELLANT.
Superior Court of New Jersey, Appellate Division.
Argued October 28, 1986.
Decided January 29, 1987.
*364 Before Judges MICHELS, O'BRIEN and SKILLMAN.
William Leighton, appellant, argued the cause pro se.
Clyde A. Szuch argued the cause for defendants-respondents Uniroyal, Inc., et al. (Pitney, Hardin, Kipp & Szuch, attorneys, Wachtell, Lipton, Rosen & Katz, of the New York Bar, of counsel, Clyde A. Szuch and Elizabeth J. Scheer and Mark Wolinsky, of the New York Bar, on the brief).
Allen H. Klinger and Sidney B. Silverman, of the New York Bar, argued the cause for plaintiff-respondent Bernard Pogostin (Klinger, Nicolette, Mavroudis & Honig, attorneys, Silverman and Harnes, of the New York Bar, of counsel).
The opinion of the court was delivered by MICHELS, P.J.A.D.
Objector William Leighton appeals from a final judgment of the Chancery Division which, in part: (1) approved a settlement agreement concerning the merger and restructuring of defendant Uniroyal, Inc. (Uniroyal) and a class action and derivative suit instituted by plaintiff Bernard Pogostin; (2) permanently enjoined plaintiff and other interested parties from instituting an action on any of the claims extinguished by the settlement agreement, and (3) awarded plaintiff $600,000 attorneys fees, exclusive of $150,000 to be paid by Uniroyal to plaintiff's investment banker.
The chronology of events underlying this litigation is not in dispute. Uniroyal, Inc., a New Jersey corporation with its principal place of business in Middlebury, Connecticut, manufactures *365 and markets chemical, rubber and plastic products for transportation, industry, agriculture and the home. At the time this action was commenced, Uniroyal had two outstanding classes of stock: common and first preferred. The first preferred stock had a par value and liquidation preference of $100, and a non-cumulative 8% dividend preference. On April 15, 1985, Robin Acquisition Corp., a company controlled by Uniroyal shareholder Carl Icahn (Icahn), commenced a tender offer for approximately 53% of the outstanding Uniroyal common stock at $18 per share. Under Icahn's plan, common stock not acquired in the tender offer would ultimately be exchanged for undetermined debt securities having a purported value of $18 per share. Icahn did not offer to acquire any of the first preferred shares.
As the book value of Uniroyal common stock exceeded $18 per share at that time, the Uniroyal Board of Directors unanimously rejected Icahn's proposal. Efforts to find a better deal for Uniroyal shareholders resulted in a single offer made by Clayton & Dubilier, Inc. (C & D). The offer was to merge an entity called CDU Acquisition, Inc. (Acquisition) into Uniroyal. All Uniroyal common stock would be "cashed out" at $22 per share and each share of Acquisition common stock would be converted into one share of common stock in the surviving corporation, Uniroyal. Funds to accomplish the merger would be obtained by floating approximately $950 million in debt securities. Upon consummation of the merger, Uniroyal's common stock would be entirely owned by CDU Holding, Inc. (Holding), Acquisition's parent company. Shares of Uniroyal first preferred would remain issued and outstanding. Moreover, there was to be a new issue of approximately $26 million of Uniroyal second preferred stock, the rights of which would be subordinate to the rights of Uniroyal first preferred stock. C & D or its affiliates would purchase this new issue in its entirety.
To facilitate the transaction, on May 6, 1985, Uniroyal entered into an agreement with Icahn whereby he promised to *366 terminate his offer and to support the one proposed by C & D. In consideration thereof, Uniroyal agreed to reimburse Icahn $5.9 million of the expenses he incurred in making his tender offer. On this same day, May 6, 1985, Uniroyal's Board of Directors and C & D signed the merger agreement. A special meeting of Uniroyal's stockholders was scheduled for September 23, 1985 for the stockholders to vote on the proposed merger and also on certain amendments to Uniroyal's charter and by-laws.
On August 1, 1985, plaintiff, a holder of first preferred stock, filed suit against Uniroyal individually and on behalf of other first preferred stockholders. One of the allegations in the complaint was that the proposed merger amounted to a plan of liquidation, thus triggering the liquidation rights of the holders of first preferred stock. Accordingly, plaintiff sought, among other things, a mandatory injunction requiring Uniroyal to redeem the shares of first preferred, a temporary injunction against Uniroyal's proceeding with the merger and a declaratory judgment determining the rights of the first preferred shares.
In light of the shareholders' meeting scheduled for September 23, 1985, the parties had expedited discovery and engaged in settlement negotiations. These efforts culminated in the parties' signing on September 9, 1985 a Memorandum of Understanding outlining the general terms of a settlement. The principal terms of this document were embodied in a formal Settlement Stipulation on October 4, 1985. The proposed merger and the charter and by-law revisions were in fact approved at the September 23, 1985 meeting of Uniroyal's shareholders.
Pursuant to the September 9, 1985 Memorandum of Understanding, on October 3, 1985, plaintiff filed an amended complaint adding the individual Uniroyal directors as defendants and asserting derivative as well as class claims. Some of the charges made therein were that: (1) the merger was in violation of Uniroyal's by-laws; (2) the payment of certain costs in *367 connection with the merger and restructuring and a bonus to defendant Flannery constituted a breach of fiduciary duty and a waste of corporate assets, and (3) the proxy materials for Uniroyal's September 23, 1985 shareholders' meeting contained material misstatements and omissions in violation of New Jersey law.
On October 3, 1985, the trial court signed a consent order which (1) established a schedule of proceedings for a hearing on the proposed compromise contemplated by the parties; (2) set out the form of notice to be sent to the holders of first preferred stock and (3) established October 11, 1985 as the date for a hearing for the purpose of approving the manner of notice to be given to the holders of Uniroyal first preferred stock and the procedures to be followed by first preferred shareholders who desired to object to the compromise. The trial court entered another order on October 11, 1985 to help bring the proposed settlement to fruition. For purposes of settlement only, the order certified the action as a class action, the class being defined as all beneficial owners of Uniroyal first preferred stock as of May 6, 1985. The trial court found that plaintiff would fairly represent the interests of all those similarly situated and thus designated him class representative. Additionally, the order directed Uniroyal to mail to all current record holders of Uniroyal first preferred stock and to all record holders of Uniroyal first preferred stock as of May 6, 1985 notice, explaining: (1) certain background information, including the Icahn tender offer and the C & D merger; (2) the action instituted by plaintiff; (3) the terms of the Settlement Stipulation, and (4) other relevant information contained in the October 11, 1985 order. Uniroyal was similarly ordered to publish a short-form notice of the proposed settlement in The Wall Street Journal and the Bergen Record. The order also enjoined the institution, maintenance or prosecution of any action as to matters pertinent to the Settlement Stipulation. Additionally, the order stated that, upon providing timely notification, any person objecting to the proposed settlement "or who *368 otherwise wishes to be heard" may attend a hearing scheduled for November 21, 1985. As stated in the order, the purpose of this hearing was to determine:
(i) the fairness, reasonableness and adequacy of the agreement of settlement and compromise provided for in the Settlement Stipulation, and
(ii) whether a final judgment and order should be entered approving the proposed settlement and compromise and dismissing the action against Uniroyal and the Director Defendants as provided for in the Settlement Stipulation, and to pass on the fee application of plaintiff's counsel in an amount not to exceed $600,000 inclusive of disbursements.
On October 16, 1985, Uniroyal mailed the requisite notice to the first preferred shareholders and on October 20 and 21, 1985 complied with the requirements of publication notice. "[T]he only one that object[ed] to this one billion dollar transaction" was Leighton. In a letter dated November 6, 1985, Leighton identified himself as a person "who otherwise wishes to be heard" and set forth reasons why he believed the settlement should be rejected. Leighton owns five shares of Uniroyal first preferred stock. According to the records of Uniroyal's transfer agent and by Leighton's own admission, these five shares were issued to Leighton on November 18, 1985 and were probably purchased by him two to three days earlier.
At the conclusion of the November 21, 1985 hearing, the trial court found the "proposed settlement fair and reasonable" and "in the best interests of the preferred shareholders under all of the circumstances." Specifically, the trial court noted the benefits of the settlement vis-a-vis a first preferred shareholder who wanted to sell his shares before redemption would commence in 1995. It observed that at the time the leveraged buy-out was proposed, first preferred stock was selling at $30 or $40, would have been subordinate to a debt of almost $1 billion due to the merger, and had no rights of redemption. The trial court further noted that in the wake of the proposed settlement, "the market [for first preferred stock] ha[d] risen to seventy-two dollars a share."
The trial court also found that all parties were adequately represented, that it had jurisdiction, and that the settlement *369 was not violative of any statute or S.E.C. regulation. Finally, it determined that Leighton's suggestion of appointing a receiver was illogical, and that the documents Leighton filed with the court on the hearing day contained "little if anything that is new." The trial court thereupon signed the judgment on November 21, 1985. The judgment, however, was not entered on the docket until January 2, 1986. The delay in docketing apparently was due to a backlog at the Clerk's office in entering orders on the computer. On February 3, 1986, Leighton filed this appeal.

I.

Timeliness of the Appeal
The judgment under review was signed by the trial court on November 21, 1985. However, as noted above, clerical delays postponed the entry of the judgment until January 2, 1986. Leighton filed his notice of appeal with this court on February 3, 1986, over two months after the judgment was signed but only about 30 days after it was docketed. We must determine if, under our rules of court, this appeal was timely.
The rules governing the timeliness of an appeal are R. 2:4-1(a) and R. 4:47. R. 2:4-1(a) provides:
Appeals from final judgments of courts, final judgments or orders of judges sitting as statutory agents and final judgments of the Division of Workers' Compensation shall be taken within 45 days of their entry.
R. 4:47 provides:
Subject to the provisions of R. 4:42-2 (judgment on multiple claims) judgment shall be entered as follows:
(a) Unless the court otherwise orders, the clerk shall forthwith prepare, sign and enter the judgment without awaiting further direction by the court: (1) upon a general verdict of a jury; (2) upon a decision by the court that a party shall recover only a sum certain or costs or that all relief shall be denied, and (3) upon a special verdict or general verdict accompanied by answers to interrogatories which is forthwith convertible by the court into a money judgment or a judgment that relief shall be denied.
(b) Where the decision of the court grants other than monetary relief, or is reserved or where a special verdict or a general verdict accompanied by answers to interrogatories is not convertible pursuant to paragraph (a), the *370 court shall promptly approve the form of judgment and the clerk of the court shall enter it.
The notation of a judgment in the civil judgment and order docket constitutes the entry of the judgment, and the judgment shall not take effect before such entry unless the court in the judgment shall, for reasons specified therein, direct that it take effect from the time it is signed, but no such direction shall affect the lien or priority of the judgment. The entry of the judgment shall not be delayed for the taxing of costs.
These provisions establish the framework in which to analyze the timeliness of Leighton's appeal. R. 2:4-1(a) directs that an appeal from a final judgment be taken within 45 days of its entry. R. 4:47, governing the entry of judgments, explains that "[t]he notation of a judgment in the civil judgment and order docket constitutes the entry of the judgment, and the judgment shall not take effect before such entry ..." (Emphasis supplied). The language of R. 2:4-1(a) and R. 4:47 states unambiguously that the timeliness of an appeal is to be determined with reference to the date on which the judgment is docketed, not the date on which it is signed by the court.
Here, although the trial court approved the settlement agreement in open court and signed a judgment embodying that decision on November 21, 1985, the Clerk did not enter the judgment on the docket until January 2, 1986. Since Leighton filed the notice of appeal on February 3, 1986, within 45 days of the entry of judgment, the appeal was timely filed.

II.

Standing of Leighton to Object to the Trial Court's Order Approving the Settlement Agreement
Even though the appeal was filed within the period provided by R. 2:4-1(a), there remains a substantial question as to whether Leighton had the standing to object to the trial court's approval of the settlement and to prosecute this appeal. The trial court identified as a "real issue," but did not address "the status of Mr. Leighton in this litigation ... considering the date of acquisition of his shares." This was an ancillary issue in the *371 November 21, 1985 hearing in which the primary focus was the reasonableness of the settlement agreement. However, on this appeal, the question of Leighton's standing to object to the order approving the settlement agreement is of paramount importance. Although Leighton gives only cursory attention to this issue in his brief, both respondents address it at length. Thus, we must examine the threshold issue of standing.
N.J.S.A. 14A:3-6(1) of the New Jersey Business Corporation Act deals with actions by shareholders and expressly provides that:
No action shall be brought in this State by a shareholder in the right of a domestic or foreign corporation unless the plaintiff was a holder of shares.... at the time of the transaction of which he complains, or his shares ... devolved upon him by operation of law from a person who was a holder at such time. [Emphasis supplied].
See also R. 4:32-5 (which states that in a derivative action, "the complaint shall be verified and allege that the plaintiff was a shareholder at the time of the transaction of which he complains." (Emphasis supplied)).
Although the contemporaneous ownership rule governs the issue of standing to bring a derivative suit, it is, nonetheless, applicable in this case where the question is whether Leighton has standing to object to a settlement agreement. As recognized by the Fifth Circuit Court of Appeals, the two issues are so closely related that the test to resolve one is equally appropriate for the resolution of the other. See Darrow v. Southdown, Inc., 574 F.2d 1333, 1336 (5th Cir.1978), cert. den. sub. nom., D. Doyle Mize and Addis Corporation v. Stella Darrow, 439 U.S. 984, 99 S.Ct. 574, 58 L.Ed.2d 655 (1978). Darrow involved an appeal from a settlement agreement approved by the district court "in partial resolution of three class action  shareholders' derivative suits." Id. at 1335. There, appellant Mize was the principal target of all three suits which alleged that, as chairman and chief executive officer of appellee corporation, he had engineered several transactions to enrich himself and his colleagues at the corporation's expense. Thus, although the settlement agreement dismissed many of the *372 charges levied in the three actions, it preserved the claims against Mize and his cohorts. Mize appealed from the judgments approving the settlement not in his capacity as defendant, but rather as a stockholder seeking to protect the rights of the corporation which he allegedly had injured. This blatant conflict of interest coupled with the requirement of Fed.R. Civ.P. 23.1 that a plaintiff in a derivative suit fairly and adequately represent the interests of similarly situated shareholders, led the Fifth Circuit Court of Appeals to conclude that "on principles akin to standing, Mize ... [could not] object to the settlement." Id. at 1336. (Emphasis supplied).
The emphasized language underscores the fact that that case concerned whether an individual had standing to object to an agreement which settled three derivative suits. Darrow did not present the question of whether appellant had standing to bring the derivative actions. Nonetheless, the Darrow court measured Mize's ability to object to the settlement agreement "by asking whether he could have brought a derivative action in the first instance." Ibid. Thus, the Darrow court analyzed the standing issue under Fed.R.Civ.P. 23.1. In light of the similarity between Fed.R.Civ.P. 23.1[1] and the provisions involved herein, we should determine Leighton's standing to object under the requirements set forth in N.J.S.A. 14A:3-6(1) and R. 4:32-5.
However, application of these provisions is not straightforward in this matter. N.J.S.A. 14A:3-6(1) and R. 4:32-5 require ownership of stock prior to the transaction of which one is complaining. Here, there was a series of events commencing with the May 6, 1985 agreements between Uniroyal and Icahn, *373 and Uniroyal and C & D and culminating in the November 21, 1985 hearing at which time the settlement was approved. Resolution of the standing issue hinges upon identifying which of these events is the "transaction" of which Leighton is complaining. If the transaction, as defined, occurred prior to November 15 or 16, 1985 when Leighton purchased his shares of Uniroyal first preferred, Leighton lacks standing. However, if the transaction is deemed to have occurred subsequent to Leighton's acquisition of Uniroyal first preferred stock, his appeal is properly before this court.
Because there are no reported New Jersey decisions which define the concept of "transaction," an examination of the law of other jurisdictions will prove instructive. As the issue involved herein is one of corporate law, an appropriate source of reference is the case law of Delaware. In Jones v. Taylor, 348 A.2d 188 (Del. Ch. 1975), which considered whether an expectant legacy in stock was sufficient to satisfy the requirement of contemporaneous ownership, the court discussed the Delaware counterparts to N.J.S.A. 14A:3-6(1) and R. 4:32-5. "8 Del.C. § 327 and Chancery Rule 23.1 make it clear that in order to maintain a derivative suit it must appear by the averments of the complaint that the plaintiff was ... a stockholder of the corporation at the time of the transaction of which he complains." Id. at 190. The purpose of these provisions is "to eliminate strike suits and other abuses which developed along with the derivative suit." Id. at 191. Thus, Jones establishes that the requirements and underlying purposes of the Delaware provisions parallel those of New Jersey. See Valle v. North Jersey Automobile Club, 141 N.J. Super. 568, 579 (App.Div. 1976), modified and aff'd, 74 N.J. 109 (1977) (one of the rationales for R. 4:32-5 "is that it may operate to thwart the practice of acquiring a few shares of a corporation's stock in order to harass it with litigation and force a settlement favorable to the plaintiff, a practice commonly referred to as a `strike suit.'"). Therefore, cases interpreting the Delaware *374 provisions may also explain how the provisions involved in this case should be construed.
The question of what constitutes a transaction for purposes of the contemporaneous ownership rule was directly addressed in Levien v. Sinclair Oil Corp., 261 A.2d 911 (Del. Ch. 1969). There, plaintiff was a minority stockholder in Venezuelan, a corporation owned almost entirely by defendant. One of the derivative claims asserted by plaintiff was that defendant's expansion into the Columbian oil market by means of three joint ventures was an appropriation of corporate opportunities. These joint venture agreements were consummated on June 24, 1959, April 28, 1960 and November 15, 1960, respectively. However, the subsidiary through which defendant entered these agreements was formed on March 18, 1959 expressly for purposes of entering the Columbian oil market. Plaintiff became a stockholder of Venezuelan on April 19, 1960.
Plaintiff argued that because oil had not been discovered in commercial quantities in Columbia until after April, 1960, corporate opportunities did not exist and therefore could not have been appropriated until that time. Having acquired his stock in April, 1960, plaintiff maintained that he was already a shareholder at the time of the wrongful appropriation which, according to plaintiff, was the transaction of which he was complaining. The Levien court disagreed. Finding that the appropriation occurred in 1959 when defendant founded a corporation as a vehicle for its operations in Columbia, the court stated: "That is the fundamental basis which underlies the complaint, that is the `transaction' under attack. What followed [the three joint ventures] merely implemented the 1959 action." Id. at 922. Even though two of the joint venture agreements were signed after plaintiff had become a shareholder, the Levien court concluded that plaintiff lacked standing to complain about any aspect of the lost corporate opportunities.
Another case which is instructive on how to define transaction in the context of the contemporaneous ownership rule is Lavine v. Gulf Coast Leaseholds, Inc., 122 A.2d 550 (Del. Ch. *375 1956). Plaintiff in Lavine, a common stockholder of Gulf Coast Leaseholds, Inc. (Gulf), charged the corporate and individual director defendants with an illegal stock exchange. Alleging that the transaction at issue was completed prior to plaintiff's becoming a shareholder, defendants moved for partial summary judgment and to strike a part of the complaint.
In resolving this dispute, the Lavine court noted when certain critical events occurred. On October 29, 1954, defendants sent to Gulf's Class A stockholders the offer to make the exchange with the stipulation that the proposed exchange would only be effective upon shareholder approval. Approval was in fact granted at a general meeting of stockholders on March 30, 1955. Sometime in the interim, but no later than December 22, 1954, plaintiff became the owner of Gulf common stock. On the basis of these facts, the court in Lavine concluded that plaintiff had become a stockholder before the transaction complained of was completed. The explicit condition in the exchange offer that it was made subject to stockholder approval postponed completion of the transaction until the March 30, 1955 meeting. By this time, plaintiff had acquired his shares and, therefore, standing to challenge any subsequent corporate action.
The analyses in Levien and Lavine are useful tools for resolving the instant controversy. Leighton purchased his shares of Uniroyal first preferred on or about November 15, 1985. At that point, the only act which had yet to be completed was the court's approving the parties' settlement agreement. Thus, Leighton apparently contends that the November 21, 1985 order, which simply gave judicial sanction to the settlement, was the transaction of which he is complaining. A brief review of the events giving rise to this case makes clear that Leighton's argument is untenable.
The agreement in which Uniroyal committed itself to pay Icahn $5.9 million to support the merger was consummated on May 6, 1985. The merger agreement itself was entered into on this same date and received shareholder approval on September *376 23, 1985. It was because of these two agreements that plaintiff filed suit on August 1, 1985 and that the settlement, embodied in the November 21, 1985 order, was reached. These facts conclusively prove that the agreements which accomplished the merger are "the fundamental basis which underlies the complaint, [they are] the `transaction' under attack." Levien, supra, 261 A.2d at 922. The ensuing litigation and settlement were spawned by this transaction which commenced on May 6, 1985. As in Lavine, completion of this transaction required shareholder approval. Such approval was forthcoming on September 23, 1985, long before Leighton became a holder of Uniroyal first preferred stock.
An examination of the record also supports the conclusion that the merger agreements constitute the transaction of which Leighton is complaining. At the November 21, 1985 hearing, Leighton remarked that "the settlement of the class claims are good and they should be put through." Clearly, his opposition to the settlement was not directed at the rights or benefits it conferred upon the class of first preferred shareholders. Rather, Leighton's objections were premised on the bar of "derivative suits by any shareholder of Uniroyal" that would be effected by the settlement. Specifically, Leighton alleged that the $47.9 million spent on the merger and the $5.9 million paid to Icahn constituted waste which, by virtue of the settlement, could not be redressed through a derivative action. These points are reiterated in Leighton's brief on this appeal.
Thus, the record establishes that the primary reason for Leighton's objections was the expenditure of millions of dollars of corporate funds in support of the merger. As previously noted, the agreements which eventually led to the merger were signed on May 6, 1985. Further support for selecting this date as the "transaction date" is the reference to May 6, 1985 by the trial court in defining the class of first preferred shareholders for purposes of settlement. Apparently, the trial court believed that the agreement with Icahn and the merger agreement were central to the events of this controversy and, therefore, May 6, *377 1985 was an appropriate date by which to designate those first preferred stockholders with a community of interest. By similar reasoning, we conclude that May 6, 1985, or at the very latest, September 23, 1985, when the shareholders approved the merger, was the date of the transaction about which Leighton wishes to object. Since Leighton had not obtained his shares of Uniroyal first preferred by that time, he lacked standing to bring this appeal.

III.

Merits of the Appeal
Even if we were to ignore Leighton's lack of standing to object to the settlement and prosecute this appeal, we are nevertheless convinced that the judgment under review should be affirmed. Our study of the record in light of the arguments presented satisfies us that Judge Lester did not mistakenly exercise his discretion by approving the settlement agreement concerning the merger and restructuring of Uniroyal and that all of the issues of law raised with respect thereto are clearly without merit. R. 2:11-3(e)(1)(E).
Accordingly, the appeal is dismissed with prejudice.
NOTES
[1] Fed.R.Civ.P. 23.1 provides in part:

In a derivative action brought by one or more shareholders or members to enforce a right of a corporation or of an unincorporated association, the corporation or association having failed to enforce a right which may properly be asserted by it, the complaint shall be verified and shall allege (1) that the plaintiff was a shareholder or member at the time of the transaction of which he complains ...