

1998 Decisions

Opinions of the United
States Court of Appeals
for the Third Circuit

2-11-1998

# IBS Fin Corp v. Seidman & Assoc LLC

Precedential or Non-Precedential:

Docket 97-5056

Follow this and additional works at: http://digitalcommons.law.villanova.edu/thirdcircuit_1998

## Recommended Citation

"IBS Fin Corp v. Seidman & Assoc LLC" (1998). *1998 Decisions*. Paper 27.
http://digitalcommons.law.villanova.edu/thirdcircuit_1998/27

This decision is brought to you for free and open access by the Opinions of the United States Court of Appeals for the Third Circuit at Villanova
University School of Law Digital Repository. It has been accepted for inclusion in 1998 Decisions by an authorized administrator of Villanova
University School of Law Digital Repository. For more information, please contact Benjamin.Carlson@law.villanova.edu.

Filed February 11, 1998

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

No. 97-5056

IBS FINANCIAL CORPORATION,

Appellant,

v.

SEIDMAN AND ASSOCIATES, L.L.C.; SEIDMAN AND
ASSOCIATES II, L.L.C.; FEDERAL HOLDINGS, L.L.C.;
SEIDMAN INVESTMENT PARTNERSHIP, L.P.;
LAWRENCE B. SEIDMAN; THE BENCHMARK COMPANY,
INCORPORATED; BENCHMARK PARTNERS, L.P.;
LORRAINE DI PAOLO; RICHARD WHITMAN; ERNEST
BEIER, JR.; and DENNIS POLLACK,

On Appeal from an Order
of the United States District Court
for the District of New Jersey

D.C. No. 96-5435

Argued May 23, 1997

Before: SLOVITER, Chief Circuit Judge,*
ROTH, Circuit Judge, and POLLAK, District Judge**

(Filed February 11, 1998)

_____

*Judge Sloviter was Chief Judge of the Court of Appeals for the Third
Circuit at the time this appeal was submitted. Judge Sloviter completed
her term as Chief Judge on January 31, 1998.

**Honorable Louis H. Pollak, United States District Judge for the Eastern
District of Pennsylvania, sitting by designation.

        Edward M. Posner (argued)
        T. Andrew Culbert
        Mary Catherine Roper
        Nancy L. Harris
        Drinker Biddle & Reath
        1345 Chestnut Street
        Philadelphia, PA 19107
        Attorneys for Appellant

        Peter R. Bray (argued)
        Bray, Chiocca, Rappaport &
         Rothstadt, L.L.C.
        100 Misty Lane
        Parsippany, NJ 07054
        Attorneys for Appellees

OPINION OF THE COURT

POLLAK, District Judge.

This appeal arises from the district court's final judgment in a suit, seeking inter alia, to enforce certain disclosure provisions of the Securities Exchange Act of 1934, 15 U.S.C. SS 77b et seq. (the "Exchange Act"). The facts of the case revolve around the efforts of the IBSF Committee to Maximize Shareholder Value ("the Committee")-- a group of shareholders of IBS Financial Corporation ("IBSF"), a New Jersey corporation -- to obtain two seats on IBSF 's seven-member board.

In the summer of 1996, some five months before the expected date of IBSF 's 1996 annual meeting, the incumbent IBSF board reduced the number of board seats from seven to six. The board later rejected the Committee's nominee for the one open seat, citing the Committee's failure to comply with certain provisions of the IBSF Certificate of Incorporation. With a view to getting judicial ratification of the board's course of action, IBSF in the fall of 1996 brought this suit for a declaration that (1) the Committee's "Schedule 13D" statement filed with the Securities and Exchange Commission ("SEC") did not conform to the requirements of 17 C.F.R. S 240.13d-101,

2

and (2) the board properly rejected the Committee's board nominee. Some members of the Committee counterclaimed, seeking an injunction requiring IBSF 's board to reinstate the board seat it had eliminated.1 The district court, in an opinion handed down on January 23, 1997, found in favor of the Committee on each issue, ruling that (1) the Committee's Schedule 13D statement was complete; (2) IBSF was equitably estopped from rejecting the Committee's board nominee; and (3) IBSF acted improperly in reducing the number of board seats. The district court accordingly ordered IBSF to reinstate the eliminated board seat and to place two Committee nominees on the ballot at the upcoming annual meeting. We will reverse the district court's first two determinations, but will affirm the district court's determination that IBSF's reduction of the number of board seats was improper.

I. Dramatis personae

Identification of the numerous individuals and entities that make up the IBSF Committee to Maximize Shareholder Value is important to an understanding of the issues in this case, particularly the issue of the completeness of the Committee's Schedule 13D statement. We will borrow (and modestly enlarge, with bracketed inserts) the district court's concise description of the principal players:

> [Plaintiff-appellant] IBS Financial Corp. ("IBSF") is a savings and loan holding company owning Interboro Savings & Loan Association ("Interboro"). IBSF 's shares are publicly registered pursuant to the Securities Exchange Act of 1934, 15 U.S.C. SS 77b et seq. (the "Exchange Act"), and actively traded. Defendants together own approximately 8.5% of the outstanding shares of IBSF common stock.
>
> Seidman & Associates, L.L.C. (SAL) is a limited liability company managed by Lawrence B. Seidman ("Seidman"). SAL's members are Seidman, Seidcal & Associates, L.L.C. ("Seidcal"), Sonia Seidman ("Mrs.

---

1. Other claims and counterclaims were litigated at the district court level, but are not before us on appeal.

Seidman"), and two other individuals. . . . Pursuant to SAL's operating agreement, Seidman as managing member has exclusive and broad investment powers. A majority in interest, however, may remove or replace Seidman as managing member with or without cause upon payment of a removal penalty. [A majority in interest also has complete discretion with respect to "[a]ll decisions, consents, authorizations and rights in connection with the business and affairs" of SAL.] Seidcal currently owns a 71.43% interest in SAL but takes no active role in its affairs.

Seidman & Associates II, L.L.C. ("SAL II") is also a limited liability company managed by Seidman. SAL II's members are Mrs. Seidman and Seidcal. . . . SAL II's operating agreement grants Seidman as manager exclusive and broad investment powers. A majority in interest, however, may remove or replace Seidman as manager with or without cause. [As with SAL, a majority in interest has complete discretion with respect to "[a]ll decisions, consents, authorizations and rights in connection with the business and affairs" of SAL II.] At present, Seidcal owns a 75% interest in SAL II but takes no active role in its affairs.

Federal Holdings, L.L.C. ("Federal") is a limited liability company managed in part by Seidman. Federal's members are Charisma Partners, L.P. ("Charisma") and nine individuals. [Charisma in turn has one general partner, 8th Floor Realty Corp. ("8th Floor"), whose Vice President is Kevin Moore.] Under Federal's operating agreement, Seidman is investment manager and enjoys exclusive and complete power to buy, sell, and vote Federal's stock. The operating agreement names Kevin Moore ("Moore") administrative manager and clothes him with the authority to make non-investment decisions and remove Seidman as investment manager for cause [until June 13, 1997, and to remove Seidman for any reason thereafter. The agreement makes no provision for removing Moore as administrative manager.] Neither Charisma, 8th Floor, nor Moore takes an active role in Federal's investment affairs.

4

. . . .

 Seidcal is composed of several members of the Cali
family. Brant B. Cali is Seidcal's administrative
manager, but Seidcal's operating agreement provides
that a majority in interest shall manage and conduct
Seidcal's business affairs. According to Brant Cali, the
lion's share of Seidcal's funding probably derives from
three Cali family "seniors," namely John J. Cali, Angelo
Cali, and Ed Leshowitz, who are not themselves Seidcal
members but whose children are Seidcal members.

 . . .

 Defendants SAL, SAL II, Federal, . . . [and] Seidman,
[among others] . . . comprise an unincorporated entity
known as the "IBSF Committee to Maximize
Shareholder Value" (the "Committee"). As the name
suggests, the Committee aims to maximize the value of
their IBSF shares.

IBS Financial Corp. v. Seidman & Associates, L.L.C., 954 F.
Supp. 980, 983-84 (D.N.J. 1997) (citations omitted).

II. Background

The facts relating to the three dominant issues, and the
district court's ruling on each of these issues, may be
summarized as follows:

A. Schedule 13D statement:  In September 1995, the
Committee filed a "Schedule 13D" statement with IBSF and
the SEC. The Securities Exchange Act of 1934 requires the
filing of a Schedule 13D statement by "any person who . . .
is directly or indirectly the beneficial owner of more than 5
per centum" of a class of equity securities, including a
syndicate or group acting for the purpose of acquiring such
ownership, 15 U.S.C. S 78m(d)(3), within ten days of
acquiring such ownership, id. S 78m(d)(1). The SEC's
implementing regulations also require, via Instruction C,
information regarding "each person controlling" a member
of a group filing a Schedule 13D statement. 17 C.F.R.
S 240.13d-101 Instruction C.

The Committee amended its initial Schedule 13D
statement nine times, with the ninth amendment filed

December 3, 1996, some three weeks after this litigation was commenced. As amended, the Committee's Schedule 13D statement provides the information required by the SEC's regulations, 17 C.F.R. SS 240.13d-1 to -101, with respect to SAL, SAL II, and Federal, and with respect to Seidman as a "person controlling" SAL, SAL II, and Federal. However, no information was provided with respect to Seidcal, Charisma, 8th Floor, Moore, or those who may be perceived as "controlling" Seidcal, Charisma, 8th Floor, and Moore.

The district court, in its January 23, 1997 opinion, ruled that the Committee's Schedule 13D recitals were complete, because Seidman managed SAL, SAL II, and Federal without consulting others, and, indeed, the very purpose of establishing each of the three funds was "to create a fund for Seidman to invest in financial institutions at his discretion." IBS Financial Corp., 954 F. Supp. at 988. "Looking to the realities of each organization," the district court concluded "that Seidman and not Seidcal controls both SAL and SAL II within the meaning of Instruction C." Id. at 987. Moreover, "Seidman makes all of Federal's investment decisions without consulting Moore or other investors . . . . Nor has IBSF alleged that Moore intends to remove Seidman or that he uses his authority to do so to influence Seidman's investment decisions . . . . Accordingly, the court concludes that Moore is not a `controlling person' within the meaning of Instruction C." Id. at 988.

B. Committee nominees:  On October 7, 1996, the Committee gave IBSF the names of two nominees -- Ernest Beier and Richard Whitman -- for the two seats it expected to be open at the 1996 annual meeting; when informed that only one seat would be open, the Committee selected Beier as its nominee for that seat. The Committee also supplied IBSF with information purportedly in compliance with Article 9.3 of IBSF 's Certificate of Incorporation.

Article 9.3 requires that stockholders' nominations of potential members of the board be submitted to the board in advance of the annual meeting. Each nomination must be accompanied by certain information about the nominee, including the information "that is required to be disclosed in solicitations of proxies with respect to nominees for

6

election as directors, pursuant to Regulation 14A under the Exchange Act." Article 9.3 gives the board the power to reject nominations that are untimely or incomplete. If the board believes that a submission is incomplete, it must promptly notify the stockholder making the nomination; the stockholder then may cure the identified deficiencies within five days. If the board reasonably determines that the stockholder has not cured any material deficiency, the board has the power under Article 9.3 to reject the nominee.

The Committee's submission of the Beier nomination was timely. However, IBSF deemed it incomplete. The problem, IBSF advised the Committee on October 31, 1996, was that, although the Committee's submission reported that "several" of Seidman's clients had given him sole voting power as to their shares, the submission did not identify the clients. IBSF believed that the identity of the clients was required to be disclosed by Regulation 14A of the Securities Exchange Act, and therefore was required by Article 9.3 to be reported to the IBSF board. The Committee asked for an extension of the five-day cure period until November 8, 1996; the IBSF board granted the request. On November 8, in Amendment 8 to the Committee's Schedule 13D statement, the Committee disclosed information about Seidman's arrangements with one of his clients, Michael Mandelbaum.

The Committee did not provide information about Seidman's arrangements with his other clients until December 3; on that date the Committee submitted a ninth amendment to its Schedule 13D statement – an amendment found by the district court to complete the Committee's required disclosures. But prior to the Committee's December 3 filing, IBSF, relying on its authority under Article 9.3 of its certificate of incorporation to reject nominations "not timely made," brought this suit seeking, inter alia, a declaration that it was entitled not to recognize the Beier nomination. However, the district court, in its opinion of January 23, 1997, "decline[d] to [so declare] for two reasons." IBS Financial Corp., 954 F. Supp. at 991. First, the district court concluded that because IBSF had accepted the Committee's nominations in 1995,

7

allowing IBSF to reject the Committee's "substantially similar submissions" in 1996 would be " `unjust in the eyes of the law.' " Id. (quoting Miller v. Teachers' Pension & Annuity Fund, 179 N.J. Super. 473, 477, 432 A.2d 560, 562 (App. Div.), cert. denied, 88 N.J. 502, 443 A.2d 714 (1981). Second, the district court reasoned that the Committee's untimeliness had not prejudiced IBSF, since the pertinent information had in fact been disclosed, albeit belatedly, via the December 3, 1996 Schedule 13D amendment.

C. Size of the IBSF board:  In December 1995, the Committee attempted to elect two independent directors to the then-seven-member IBSF board. When that attempt proved unsuccessful, it was generally expected that the Committee would again seek two board seats in 1996. In July 1996, board member Frank Lockhart, who was one of two incumbent directors slated to run for reelection that year, announced that he intended to step down; the IBSF board thereupon voted to eliminate the Lockhart seat as of the 1996 annual meeting, leaving only one seat open for election at that meeting.

IBSF 's chairman, Joseph M. Ochman, Sr., and another director, Thomas J. Auchter, gave deposition testimony that the board acted for three reasons in reducing the board's size from seven to six. First, the board thought that its work could be performed as well with one fewer member, because most of the decisions affecting IBSF -- a holding company -- were made by the board of IBSF 's operating subsidiary, Interboro Savings & Loan Association. Second, the board thought a smaller size would provide more flexibility if IBSF should in the future undertake acquisitions of other companies. Third, the board wished to hinder the Committee's attempt to gain a substantial presence on the board.

The district court concluded that the first two proffered reasons were "suspiciously pretextual" and that "the third rationale for eliminating Lockhart's board seat[was] the primary motivation behind the IBSF board's decision." 954 F. Supp. at 985. Accordingly, the district court granted judgment on the Committee's counterclaim and set aside the elimination of the seventh board seat.

D. District court opinion:  As noted above, the district court's opinion of January 23, 1997 (1) found the Committee's Schedule 13D filings to be complete, (2) declared that IBSF was estopped from rejecting Committee nominations for the board, and (3) set aside IBSF 's elimination of the seventh board seat. The district court also (4) declared that the Committee's Schedule 14Afilings were complete, and (5) declared that IBSF could not refuse to provide the Committee with a shareholder list. IBSF 's appeal challenges only the first three of these rulings.

The district court had subject matter jurisdiction pursuant to 28 U.S.C. SS 78aa, 1331, and 1367; we have jurisdiction pursuant to 28 U.S.C. S 1291. Our review of the district court's legal determinations and its application of legal precepts to facts is plenary; we review the district court's factual findings for clear error. See Epstein Family Partnership v. KMart Corp., 13 F.3d 762, 766 (3d Cir. 1994).

III. Was there adequate disclosure of individuals or entities "controlling" members of the 13D group?

IBSF argues first that the Committee failed to disclose certain information required to be publicly disclosed by section 78m(d) of the Exchange Act. This section requires that, within ten days of the date a person or group acquires beneficial ownership of more than 5% of a class of securities, certain information must be disclosed. This section "was designed `to alert the marketplace to every large, rapid aggregation or accumulation of securities, regardless of technique employed, which might represent a potential shift in corporate control.' " Hubco, Inc. v. Rappaport, 628 F. Supp. 345, 351 (D.N.J. 1985) (citations omitted).

The SEC regulations implementing section 78m(d) are at 17 C.F.R. S 240.13d-1 to -6; and the particular form -- Schedule 13D -- on which the disclosure is to be made is at 17 C.F.R. 240.13d-101. Schedule 13D specifically requires the person or group acquiring beneficial ownership of more than 5% of a class of securities to provide seven items of information.[2] The dispute between IBSF and the

_____

2. These items, in brief, are: (1) "Security and Issuer"; (2) "Identity and
Background"; (3) "Source and Amount of Funds or Other Consideration";

Committee centers on which people and entities the Committee must disclose information about.

Instruction C to Schedule 13D provides in relevant part as follows:

> If the statement is filed by a general or limited partnership, syndicate, or other group, the information called for by Items 2-6, inclusive, shall be given with respect to (i) each partner of such general partnership; (ii) each partner who is denominated as a general partner or who functions as a general partner of such limited partnership; (iii) each member of such syndicate or group; and (iv) each person controlling such partner or member.

17 C.F.R. S 240.13d-101 (emphasis added).

IBSF contends that the Committee's amended Schedule 13D statement was insufficient because it did not report information about the persons or entities "controlling" certain members of the Committee, which is a "group" responsible for filing the Schedule 13D statement. Three members of the Committee -- SAL, SAL II, and Federal -- are each primarily owned by one other entity: Seidcal Associates, L.L.C. owns 71.43% of SAL; Seidcal also owns 75% of SAL II; and Charisma Partners, L.P. owns 54.55% of Federal. IBSF argues that the Committee was obligated to file Schedule 13D information for Seidcal as a "person controlling" SAL and SAL II, and for Charisma as a "person controlling" Federal. IBSF further argues that the Committee was obligated to file Schedule 13D information about 8th Floor and Kevin Moore because, in IBSF 's view, each of them is also a "person controlling" Federal.

As described above, Seidman is the "managing member" of SAL, the "manager" of SAL II, and the "investment manager" of Federal. However, the operating agreements of each of these three companies give others the power to remove him: Seidman may be removed from his positions

_____

(4) "Purpose of Transaction"; (5) "Interest in Securities of the Issuer"; (6) "Contracts, Arrangements, Understandings or Relationships with Respect to Securities of the Issuer"; and (7) "Material to be Filed as Exhibits." 17 C.F.R. S 240.13d-101.

at, respectively, SAL and SAL II by a majority in interest of the members of those companies; and Seidman may be removed from his position at Federal by Moore, Federal's administrative manager (for cause before June 13, 1997, and without cause thereafter).

IBSF argues that Seidcal is a "person controlling" SAL and SAL II by virtue of its majority ownership interest in these companies; the defendants argue that only Seidman, as manager or managing member, is a "person controlling" these companies. Similarly, IBSF argues that Charisma, 8th Floor, and Moore are all "person[s] controlling" Federal, while the defendants argue that only Seidman is a "person controlling" Federal. The district court's analysis of this question concluded that only Seidman is a "person controlling" SAL, SAL II and Federal because, in practice, only he has exercised actual control over these companies. We disagree.

The SEC has defined "control" as the term is used in "forms for statements and reports" filed pursuant to section 13 of the Securities Exchange Act of 1934 -- forms such as Schedule 13D -- as follows:

> The term "control" (including the terms "controlling," "controlled by" and "under common control with") means the possession, direct or indirect, of the power to direct or cause the direction of the management and policies of a person, whether through the ownership of voting securities, by contract, or otherwise.

17 C.F.R. S 240.12b-2. Because the definition of "control" in S 240.12b-2 directs the court to look to "the power to direct or cause the direction of the management and policies of a person," Seidman's actual control of SAL, SAL II, and Federal does not preclude a finding that Seidman's control is shared with others if others have the power to direct the management and policies of these companies.3

_____

3. This court has previously construed the term "controlling person" as the term is used in Section 20(a) of the Securities Exchange Act, 15 U.S.C. S 78t(a), which under certain circumstances imposes secondary liability on those who control violators of the securities laws. In Rochez Brothers, Inc. v. Rhoades, 527 F.2d 880 (3d Cir. 1975), this court quoted the definition of "control" in 17 C.F.R.S 240.12b-2 and then said:

11

The operating agreements of SAL and SAL II give the "majority in interest of the Members" -- i.e., Seidcal -- power to remove Seidman as manager or managing member. Seidcal also has the power to carry on and manage all decisions, consents, authorizations and rights in connection with the business and affairs of both companies. These two sources of authority mean that Seidcal has had and continues to have "the power to direct or cause the direction of the management and policies" of SAL and SAL II, notwithstanding that Seidcal has refrained from, and may continue to refrain from, exercising that power. Seidcal is therefore a "person controlling" SAL and SAL II, and the Committee's Schedule 13D statement should, therefore, have included the information in items 2-6 regarding Seidcal.

The operating agreement of Federal is somewhat different. Kevin Moore, the administrative manager, has authority to remove Seidman as investment manager and also has authority over "all other decisions, consents, authorizations and rights in connection with the management of the Company." Moore therefore has"the power to direct or cause the direction of the management and policies" of Federal, and hence is a "person controlling" Federal for whom Schedule 13D information should have been reported.

The Federal operating agreement puts all administrative powers in the hands of Moore, and makes no provision for his removal as administrative manager; the operating agreement does not in explicit terms vest any authority in Charisma or its sole general partner, 8th Floor, of which

_____

Many factors are involved in determining if one is a "controlling person." In making this determination, the courts have given heavy consideration to the power or potential power to influence and control the activities of a person, as opposed to the actual exercise thereof.

Id. at 890-91. There is no apparent reason for the term "controlling person," as it is used in section 20(a), to be more broadly construed than the term "person controlling," as it is used in Instruction C to Schedule 13D.

12

Moore is vice-president. At oral argument in this court, counsel for IBSF acknowledged that its contention that Charisma and 8th Floor must file Schedule 13D information rests on an inference that, in his post as administrative manager of Federal, Moore represents the interests of 8th Floor and Charisma. We are unwilling to draw such an inference in the absence of any formal legal authority for 8th Floor or Charisma to direct Moore's decisions with respect to Federal. Accordingly, we conclude that the Committee was under no obligation to file information regarding Charisma or 8th Floor in its Schedule 13D statement.

IV. Was the IBSF board entitled to reject the Committee's nominees?

As noted above, the district court ordered IBSF to place the Committee's two nominees on the 1996 ballot for two reasons. First, the district court held that IBSF was equitably estopped from rejecting the Committee's nominations, because it had accepted substantially similar nominations the year before. Second, the district court found that IBSF would not be prejudiced by being required to accept the nominations. We find neither reason persuasive.

New Jersey's Supreme Court has defined equitable estoppel as follows:

> `the effect of the voluntary conduct of a party whereby he is absolutely precluded, both at law and in equity, from asserting rights which might perhaps have otherwise existed . . . as against another person, who has in good faith relied upon such conduct, and has been led thereby to change his position for the worse . . . .'

W.V. Pangborne & Co., Inc. v. New Jersey Dep't of Transportation, 562 A.2d 222, 227 (N.J. 1989) (quoting Carlsen v. Masters, Mates & Pilots Pension Plan Trust, 403 A.2d 880, 882 (N.J. 1979)) (alterations in original).4 The
_____

4. The district court applied New Jersey law to determine whether IBSF was equitably estopped from rejecting the Committee's nominees. As no party contests the application of New Jersey law and IBSF is a New Jersey corporation, we follow the district court and look to New Jersey law to determine whether IBSF is equitably estopped from rejecting the Committee's nominees.

court has added that "[t]he doctrine of equitable estoppel is applied `only in very compelling circumstances,'`where the interests of justice, morality and common fairness clearly dictate that course.' " Palatine I v. Planning Board, 628 A.2d 321, 328 (N.J. 1993) (quoting Timber Products, Inc. v. Chester Township, 500 A.2d 757, 760 (N.J. Super. Ct. Law Div. 1984), and Gruber v. Mayor of Raritan Township, 186 A.2d 489, 495 (N.J. 1962).

The district court's invocation of the doctrine of equitable estoppel took as its premise that "IBSF's approval of the Committee's substantially similar submissions [in 1995] no doubt influenced the content and timing of the Committee's current submissions." That being so, the district court felt it would be " `unjust' " to "allow the board's changed interpretation of its Certificate of Incorporation to work prejudice to defendants' nomination." We see no injustice here. Whatever basis the Committee may have had for relying on IBSF 's acceptance of the 1995 submissions necessarily vanished when the Committee was placed on notice of IBSF 's dissatisfaction in 1996. A situation in which the Committee had eight days to cure the announced deficiencies and elected not to do so hardly rises to the level of " `very compelling circumstances,' `where the interests of justice, morality and common fairness clearly dictate' " that IBSF not be permitted to bar the Committee's nominations.

Moreover, the district court's determination that IBSF would not be prejudiced by a requirement that it accept the Committee's nominees, while perhaps correct as a factual matter, is irrelevant as a legal matter. The Certificate of Incorporation gives the board the discretion to reject nominations if the nominees do not provide specified information, after notice, within the time given to cure. "The certificate of incorporation . . . constitute[s] a contract between the corporation and its stockholders and the stockholders inter sese." Faunce v. Boost Co., 83 A.2d 649, 651 (N.J. Super. Ct. Ch. Div. 1951). This is not a case in which a provision of the certificate of incorporation offends public policy and therefore may not be enforced. See, e.g., New Jersey v. Jefferson Lake Sulphur Co., 178 A.2d 329, 338-39 (N.J. 1962). Article 9.3 -- which provides notice and an opportunity to cure before a nomination is rejected -- is

14

reasonable on its face. Mere absence of prejudice to the corporation does not empower a court to veto a board of directors' exercise of a discretionary authority vested in the board by the certificate of incorporation.5

Accordingly, we conclude that the IBSF board was acting within its authority in declining to accept the nominations of the Committee for failure to comply with the provisions of Article 9.3 of IBSF's certificate of incorporation.

V. Was the IBSF board entitled to reduce the board size
       from seven to six?

The district court determined that a New Jersey court would measure the propriety of the board's action under the standard set forth by Delaware courts in Blasius v. Atlas Corp., 564 A.2d 651 (Del. Ch. 1988), and subsequent cases. Blasius requires that a board's action primarily motivated by a desire to frustrate shareholder franchise be justified by a compelling interest. In Blasius, Chancellor Allen justified heightened scrutiny for board action that dilutes the effectiveness of the shareholder vote because:

> [The shareholder franchise] is critical to the theory that
> legitimates the exercise of power by some (directors
> and officers) over vast aggregations of property that
> they do not own. Thus, when viewed from a broad
> institutional perspective, it can be seen that matters
> involving the integrity of the shareholder voting process
> involve considerations not present in any other context
> in which directors exercise delegated power.

_____

5. In relying on the absence of prejudice to IBSF, the district court cited
cases in which a corporate board asked a court to exercise the court's
judicial discretion to enjoin proxy solicitations. See Cook United, Inc. v.
Stockholders Protective Committee of Cook United, Inc., Fed. Sec. L. Rep.
P 96,875, 1979 WL 1209 (S.D.N.Y. 1979); Twentieth Century Fox Film
Corp. v. Lewis, 334 F. Supp. 1398 (S.D.N.Y. 1971). Although it may well
be appropriate for a court to decline to enjoin a proxy contest for failure
to comply with SEC rules where such failure has not demonstrably
prejudiced the moving party, this case is different. Here, the court is not
making an original determination whether to enjoin a proxy contest, but
is reviewing actions of the board that are properly within the board's
purview.

Blasius, 564 A.2d at 659.

The district court found that the board's primary motivation in reducing the number of board seats was to hinder the Committee's attempts to gain a voice on the board and held that, under Blasius, board action taken for such a purpose was invalid. IBSF (1) objects to the district court's importation of Blasius into New Jersey law and (2) contends that even under the Blasius standard, as that standard has been further refined by Delaware courts, the board's action was valid.

IBSF argues that because New Jersey's business judgment rule, as codified at N.J.S.A. 14A:6-1 6 & 6-14,7 differs significantly from Delaware's, New Jersey courts would not look to Delaware to inform their application of the business judgment rule. IBSF is correct that, unlike Delaware, New Jersey has chosen not to apply heightened scrutiny to director action taken in defense against a proposed acquisition. N.J.S.A. 14A:6-1(3) states that when

_____

6. N.J.S.A. 14A:6-1 provides in relevant part that:

>        (3) If . . . the board of directors determines that any proposal or offer
>        to acquire the corporation is not in the best interest of the
>        corporation, it may reject such proposal or offer. If the board of
>        directors determines to reject any such proposal or offer, the board
>        of directors shall have no obligation to facilitate, remove any barriers
>        to, or refrain from impeding the proposal or offer.

7. N.J.S.A. 14A:6-14 provides in relevant part that:

>        (1) Directors and members of any committee designated by the
>        board shall discharge their duties in good faith and with that degree
>        of diligence, care and skill which ordinarily prudent people would
>        exercise under similar circumstances in like positions.
>
>        . . .
>
>        (4) In taking action, including, without limitation, action which may
>        involve or relate to a change or potential change in the control of the
>        corporation, a director shall be entitled to consider, without
>        limitation, both the long-term and the short-term interests of the
>        corporation and its shareholders. For the purpose of this

subsection, "control" means the possession, directly or indirectly, of the power to direct or cause the direction of the management and policies of the corporation, whether through the ownership of voting shares, by contract or otherwise.

16

faced with "any proposal or offer to acquire the corporation . . . the board of directors shall have no obligation to facilitate, remove any barriers to, or refrain from impeding the proposal or offer." Cf. Unocal Corp. v. Mesa Petroleum Co., 493 A.2d 946 (Del. 1985)(requiring the directors' response to a hostile tender offer to be proportionate to the threat posed). In this case, however, IBSF was not faced with a "proposal or offer to acquire the corporation," so N.J.S.A. 14A:6-1(3) does not insulate the board's action from judicial scrutiny.

Neither the briefs of the parties, nor our researches, have identified New Jersey cases which have addressed the level of scrutiny to be applied to action by a board of directors intended to hamper the exercise by some shareholders of their franchise. Given the absence of pertinent New Jersey case law, the district court was, in our judgment, correct in concluding that New Jersey courts confronted with a case like the case at bar would look to Delaware case law. When faced with novel issues of corporate law, New Jersey courts have often looked to Delaware's rich abundance of corporate law for guidance. See, e.g., In re Prudential Ins. Co. Derivative Litigation, 659 A.2d 961, 968-69 (N.J. Super. App. Div. 1995)("Delaware is recognized as a pacesetter in the area of corporate law."); Strasenburgh v. Straubmuller, 683 A.2d 818, 829 (N.J. 1996)(citing Delaware law for the importance of distinguishing between individual and derivative actions); Pogostin v. Leighton, 523 A.2d 1078 (N.J. Super. Ct. App. Div.)("As the issue involved herein is one of corporate law, an appropriate source of reference is the law of Delaware."), cert. denied, 484 U.S. 964 (1987).

We believe that it is likely that a New Jersey court would again follow Delaware law in this case, especially because New Jersey shares Delaware's interest in providing significant protection to a shareholder's right to vote. In Penn-Texas Corp. v. Niles-Bement-Pond Co., 112 A.2d 302, 307 (N.J. Ch. 1955), the court found that the postponement of an annual meeting by unilateral action of the board of directors constituted an infringement of the shareholders' right to vote sufficient to invoke intervention by the court. Penn-Texas cited Faunce v. Boost Co., 83 A.2d 649 (N.J. Ch. 1951), where the court characterized the right to vote as a

17

"basic contractual right" and "an incident to membership or of the property in the stock, of which the stockholder or member cannot be deprived without his consent." Id. at 652. In light of the protection that New Jersey law has provided to shareholder voting rights, the district court was not in error in finding that New Jersey courts would look to Blasius to assess the propriety of the board's reduction in size.

IBSF also contends, however, that the district court erred in applying Blasius to this case because: 1) the district court erred in finding that the board's primary motivation in reducing its size was to hinder the Committee's proxy solicitation; and 2) Blasius applies only where the franchise process has been engaged in a challenge for control of a company and in the present case the franchise process had not been engaged nor could the Committee have gained control of IBSF. Analysis of these contentions requires review of a factual finding by the district court as well as characterization of Blasius itself.

In challenging the district court's finding that the board's elimination of an open seat was primarily intended to impede the Committee's attempts to gain a voice on the board, IBSF urges that the district court improperly disregarded the directors' other reasons for reducing board size -- 1) flexibility to add board members in case of an acquisition, and 2) efficiency. IBSF does not dispute that the directors were motivated at least in part by a desire to prevent the Committee from being able to gain two seats on the board.8 The district court found that the efficiency and

_____

8. As the district court noted, the chairman of IBSF's board, Joseph M. Ochman, Sr., gave deposition testimony that "[i]n the event there was any proxy contest, [it would be] in the best interest[s] of all shareholders
to have only one nominee for directorship rather than two." R. at 302a. Later in his deposition, Ochman linked the best interests of the shareholders to the defeat of the proposal urged by the Committee, stating that:

        [T]he dissident group of shareholders were advocating very clearly in
        their material and press releases that we should hire an investment
        banker and put the company up for sale through an auction. The
        board believed then and firmly believes today that it is absolutely

18

flexibility rationales were pretextual in light of the ability of the board to accommodate up to fifteen members in the event of an acquisition, and the lack of documentation of discussions of flexibility or efficiency gains from a reduction in board size at prior board meetings.9  IBS Financial Corp., 954 F. Supp. at 985. This court is not convinced that the district court was clearly in error in determining that, of the three rationales, the desire to foreclose the Committee from electing two directors was paramount. To the contrary, the district court's finding appears to us to have substantial support in the record.

IBSF argues that even if the board was primarily motivated by a desire to prevent the Committee from gaining two seats on the board, the board's action does not fall within the Blasius rubric because at the time the board reduced its size there was no chance that the Committee could take control of the board. The district court rejected the argument that a contest must be for outright control of the board in order to trigger Blasius, reasoning that the

_____

> not in the best interest of all our shareholders and that long range,
> that we can build the franchise, develop the company further, and
> maximize the shareholder value.

Id.

Furthermore, another IBSF director, Thomas J. Auchter, testified on deposition that one of the reasons discussed by the board for reducing the board size was that the reduction "would make it more difficult for Mr. Seidman to gain control of IBSF." R. at 293a.

9. The district court also found that the board of Interboro (IBSF's operating subsidiary) remained unchanged, at seven directors, and that, in the event of an acquisition, new members would have to be added to that board. The district court further observed that the efficiency and flexibility rationales were dubious because they"arose for the first time in depositions taken after the Court alerted the parties to the viability and case law applicable to [the claim for reinstatement of the second open director seat]." However, in response to IBSF's motion to correct or modify the record, the district court revised its findings of fact to read:

> Each rationale arose for the first time in depositions taken after the
> litigation had commenced and in all but one instance after the
> Court alerted the parties to the viability of and case law applicable
> to defendants' first counterclaim.

anticipated 1996 election represented a step towards control of the board by the Committee.10  We agree.

Blasius dictates that actions taken for the purpose of interfering with the shareholder franchise must be supported by compelling justification. The board did not establish a compelling justification in the district court and does not urge such a justification in this appeal. Because we uphold the district court's finding that the board reduced its size in order to frustrate the Committee's attempt to gain a substantial presence on the board, and because the board has not articulated a compelling justification for its action, the district court's invalidation of the reduction in the board will be sustained.

_____

10. IBSF 's attempts to characterize Blasius and the cases following it as requiring that the proxy process be "engaged" are also unsuccessful. We read the cases cited by IBSF in support of an "engagement" requirement as allowing Delaware courts to consider the degree to which the proxy process has been invoked in determining whether action taken by a board is primarily motivated by a desire to impair the shareholder franchise. See, e.g., Stahl v. Apple Bancorp, Inc., 579 A.2d 1115 (Del. 1990)(denying preliminary injunctive relief because"while postponement of a noticed meeting will in some circumstances constitute an inequitable manipulation, I can in no event see that the franchise process can be said to be sufficiently engaged before the fixing of this meeting date to give rise to that possibility"); Dolgoff v. Projectavision,
1996 WL 91945 (Del. Ch. Feb. 29, 1996)(denying preliminary injunctive relief where an annual meeting was scheduled in conformance with the corporation's bylaws and where there was no reason to believe a proxy contest was at hand because these facts indicated that the board's action in scheduling the meeting early in the year was not intended to thwart the exercise of the shareholder franchise); Kidsco v. Dinsmore, 674 A.2d 483 (Del. Ch. 1995)(citing Stahl for the proposition that "the franchise process [cannot] be said to be sufficiently engaged before the fixing of the meeting date to give rise to . . . .[the possibility of inequitable manipulation]." None of these cases establishes a hard line rule that a proxy contest must be engaged in order for Blasius to apply. In the case at bar, it was, as noted supra, generally expected, following the Committee's failure to elect directors of its choice in December 1995, that the Committee would resume its campaign in 1996; thus when the board acted, in the summer of 1996, to eliminate the Lockhart seat as of the 1996 election, the proxy contest process had, realistically, been "engaged" ever since the fall of 1995.

20

VI. Conclusion

In sum, we (1) disagree with the district court's ruling that the Committee's Schedule 13D statement was complete, and (2) disagree with the district court's ruling that the IBSF board was equitably estopped from rejecting the Committee's nominee, but (3) agree with the district court's ruling that the IBSF board's reduction of the size of the board from seven to six was improper. Accordingly, the judgment of the district court as it relates to issues (1) and (2) is reversed, and the judgment of the district court as it relates to issue (3) is affirmed, and the case is remanded for further proceedings consistent with this opinion.

A True Copy:
Teste:

        Clerk of the United States Court of Appeals
        for the Third Circuit

21